No. 19,766.

THE STATE OF KANSAS, ex rel. H. O. CASTER, as Attorney for the PUBLIC UTILITIES COMMISSION, etc., *Plaintiff*, v. THE KANSAS POSTAL-TELEGRAPH-CABLE COMPANY, *Defendant.*

### SYLLABUS BY THE COURT.

1. UTILITIES COMMISSION—*Power to Regulate and Control Location of Telegraph Stations.* The public utilities act (Laws 1911, ch. 238) and related statutes have conferred upon the public utilities commission the power to determine whether a telegraph station long established and maintained should be abandoned.

2. SAME. The power thus granted is a valid exercise of governmental supervision and does not contravene any provision of either the national or state constitution.

3. TELEGRAPH STATION—*Can Not be Discontinued without Permission of Utilities Commission.* Where a telegraph company maintained a telegraph station for a number of years at an average deficit of $134.33 per annum it should have applied to the public utilities commission to discontinue it, and it was unlawful to close the station and quit business thereat until such permission was granted.

4. SAME—*Construction of Statutes.* Section 1796 of the General Statutes of 1909 (Laws 1893, ch. 152) is largely superseded by the public utilities act and other related statutes enacted since 1893.

5. TELEGRAPH STATION AT COUNTY SEAT—*Not Self-supporting—Utilities Commission May Permit Its Discontinuance.* Section 1796 of the General Statutes of 1909 (Laws 1893, ch. 152), requiring each telegraph company to maintain an office in the county seat of each county when its lines run through such county seat, does not limit the power of the public utilities commission to determine whether such office is self-supporting and compensatory, nor prevent the commission from relieving the telegraph company of that duty if its enforced maintenance would violate any provision of the national or state constitution, or be otherwise unduly burdensome, unreasonable or oppressive.

Original proceeding in mandamus. Opinion filed July 10, 1915. Writ temporarily withheld.

*H. O. Caster*, of Topeka, for the plaintiff.

*John C. Gage, Sanford B. Ladd*, and *Charles E. Small*, all of Kansas City, Mo., for the defendant.

The opinion of the court was delivered by

DAWSON, J.: The state of Kansas, through one of its authorized officers, invokes the original jurisdiction of this court and asks for a writ of mandamus directing the Kansas Postal-

Telegraph-Cable Company to reëstablish and maintain its telegraph station at Syracuse, the county seat of Hamilton county.

The company is a Kansas corporation, doing both domestic and interstate business. For several years it maintained a telegraph station at Syracuse; but finding that it was doing business at a loss and that there had been a deficit in its receipts as compared with its expenditures for five years last past the company closed its office and quit business in that city on January 12, 1914.

The principal complaint of the state is that the company omitted to ask and obtain from the public utilities commission an order permitting it to close its office and abandon its business at that point.

The company's answer to the alternative writ may be thus summarized: (*a*) Its business in Syracuse for the years 1909 to 1913, inclusive, was conducted at a loss aggregating $671.68, an average deficit amounting to $134.33 per annum. (*b*) It made no application to the public utilities commission for leave to close its office and discontinue its telegraph service at Syracuse and it never received the assent of the commission so to do. It avowed that it will not restore that service voluntarily. (*c*) The public are adequately served at Syracuse by the Western Union Telegraph Company and the Syracuse Telephone Company. (*d*) "This defendant avers that it is and always has been characteristic of the management of any telegraph business, such as that of this defendant, to open temporary and experimental offices in different cities and towns, in order to determine whether the business of such offices will be compensatory; that this is also true in the case of branch offices in cities, and that such offices are opened and closed and reopened, as the case may be, with frequency, depending upon the volume of the business and whether it justifies the continued maintenance of the office, and also depending upon the fluctuations of the business, which sometimes increases and sometimes decreases." (*e*) That to require the company to reëstablish its station at Syracuse and continue to do business at a loss would violate the fourteenth amendment. (*f*) That to compel the company to reëstablish and maintain its station at Syracuse until the commission gives sanction to its discontinuance would be an unlawful interference and burden upon interstate commerce, and violate sec-

tion 8 of article 1 of the federal constitution, and violate the bill of rights of the Kansas constitution.

To this answer the state filed a demurrer, which we will treat as a motion to quash or as a motion for judgment on the pleadings.

The state contends: (1) That defendant had no right to discontinue its service at Syracuse without first having obtained the sanction of the public utilities commission. (2) That section 1796 of the General Statutes of 1909 requires the maintenance of a telegraph station at Syracuse since that city is a county seat. A third contention in the state's brief was that notwithstanding the deficit in operating the telegraph station at Syracuse the company should be required to maintain it, unless it could be shown that the entire intrastate business of the company was operated at a loss; but ere the oral argument was reached certain decisions of the supreme court of the United States were handed down which abrogated that doctrine and it was abandoned. (*Nor. Pac. Ry. v. North Dakota*, 236 U. S. 585, 35 Sup. Ct. Rep. 429.)

(See, also, *Railroad Co. v. Utilities Commission*, 95 Kan. 604, syl. ¶ 3, 148 Pac. 667, 671.)

The defendant telegraph company makes the counter contentions: (1) No state law required the defendant to obtain the consent of the public utilities commission before discontinuing its service at Syracuse. (2) Section 20 of the public utilities act, as construed by plaintiff and applied to this case, is void. (3) Section 1796 of the General Statutes of 1909, requiring every telegraph company operating a line through any county seat in Kansas to maintain a telegraph station thereat, is void as applied to Syracuse.

Before considering these specific points, it will be convenient to cite the pertinent statutes.

Section 7186 of the General Statutes of 1909 provides:

"Said commissioners (the board of railroad commissioners) shall have the general supervision of all railroads operated by steam or electricity or other motive power within the state, and all express companies, sleeping-car companies, and all other persons, companies or corporations doing business as common carriers in this state; and shall inquire into any neglect or violations of the laws of this state by any person, company or corporation engaged in the business of transportation of persons or property therein, or by the officers, agents or employees thereof; and shall also from time to time carefully examine and inspect the condi-

tion of each railroad in the state, and of its equipment, and the manner of its conduct and management with reference to the public safety and convenience: Provided, This section shall not be construed as applying to street railway or electric lines operated wholly within one county."

### Section 7188 reads:

"Whenever in the judgment of the board of railroad commissioners it shall appear that any railroad corporation or other transportation company fails in any respect or particular to comply with the terms of its charter or the laws of the state, or whenever in their judgment any repairs are necessary upon its road, or any addition to its rolling-stock, or any addition to or change of its stations or station-houses, or any change in its rates for transporting passengers or freight, or any change in the mode of operating its road and conducting its business, is reasonable and expedient in order to promote the security, convenience and accommodation of the public, said commissioners shall inform such corporation of the improvement and changes which they deem to be proper by a notice thereof in writing, to be served by leaving a copy thereof, certified by the secretary of the board, with any station agent, clerk, treasurer, manager or any director of said corporation, which notice shall state the time within which said improvements or changes are required to be made; and if such orders are not complied with within the time stated in said notice, the attorney for the board shall forthwith file with the commissioners a complaint in writing, praying for an investigation of said matter, which complaint shall be heard according to the provisions of said act as in other cases."

### The public utilities act (Laws 1911, ch. 238) provides:

"SECTION 1. The Board of Railroad Commissioners of the state of Kansas is hereby constituted and created a Public Utilities Commission for the state of Kansas, and such commission is given full power, authority and jurisdiction to supervise and control the public utilities and all common carriers, as hereinafter defined, doing business in the state of Kansas, and is empowered to do all things necessary and convenient for the exercise of such power, authority and jurisdiction.

"SEC. 2. All laws relating to the powers, duties, authority and jurisdiction of the Board of Railroad Commissioners of this state are hereby adopted, and all powers, duties, authority and jurisdiction by said laws imposed and conferred upon the said Board of Railroad Commissioners, relating to common carriers, are hereby imposed and conferred upon the commission created under the provisions of this act.

"SEC. 3. The term 'public utility,' as used in this act, shall be construed to mean every corporation, company, individual, association of persons, their trustees, lessees or receivers, that now or hereafter may own, control, operate or manage, except for private use, any equipment, plant, generating machinery, or any part thereof, for the transmission of telephone messages or for the transmission of telegraph messages in or through part of the state.

"SEC. 10. Every common carrier and public utility governed by the

provisions of this act shall be required to furnish reasonably efficient and sufficient service, joint service and facilities for the use of any and all products or services rendered, furnished, supplied or produced by such public utility or common carrier and to establish just and reasonable rates, joint rates, fares, tolls, charges and exactions and to make just and reasonable rules, classifications and regulations; and every unjust or unreasonable discriminatory or unduly preferential rule or regulation, classification, rate, joint rate, fare, toll or charge demanded, exacted or received is prohibited and hereby declared to be unlawful and void, and the Public Utilities Commission shall have the power, after notice and hearing of the interested parties, to require any common carriers and all public utilities governed by the provisions of this act to establish and maintain just and reasonable joint rates wherever the same are reasonably necessary to be put in, in order to maintain reasonably sufficient and efficient service from such public utilities and common carriers.

"SEC. 14. Upon a complaint . . . that any regulation, practice or act whatsoever affecting or relating to any service performed or to be performed by such public utility or common carrier for the public is in any respect unreasonable, unfair, unjust, unreasonably inefficient, insufficient, unjustly discriminatory or unduly preferential, or that any service performed or to be performed by such public utility or common carrier for the public is unreasonably inadequate, inefficient, unduly insufficient, or can not be obtained, the commissioners shall proceed, with or without notice, to make such investigation as they may deem necessary. The commissioners may, upon their own motion, and without any complaint being made, proceed to make such investigation.

"SEC. 16. If upon such hearing and investigation the rates, joint rates, fares, tolls, charges, rules, regulations, classifications, or schedules of such common carrier or public utility governed by the provisions of this act, are found to be unjust, unreasonable, unfair, unjustly discriminatory or unduly preferential, or in any wise in violation of the provisions of this act, or of any of the laws of the state of Kansas, the Public Utilities Commission shall have the power to fix and establish, and to order substituted therefor, such rates, joint rates, fares, tolls, charges, rules, regulations, classifications or schedules as it shall find, determine or decree to be just, reasonable and necessary; and if it shall be found that any regulation, practice or act whatsoever, relating to any service performed or to be performed by such public utility or common carrier for the public in any respect unreasonable, unjust, unfair, unreasonably inefficient, insufficient, unjustly discriminatory or unduly preferential, or otherwise in violation of any of the provisions of this act, or of any of the laws of the state of Kansas, the Public Utilities Commission shall have full power, authority and jurisdiction to substitute therefor such other regulations, practice, service or act as they find and determine to be just, reasonable and necessary. All orders and decisions of the Public Utilities Commission whereby any rates, joint rates, fares, tolls, charges, rules, regulations, classifications, schedules, practice or acts relating to any service performed or to be performed by such public utility or com-

mon carrier for the public are altered, changed, modified, fixed or established, shall be reduced to writing, and a copy thereof duly certified, shall be served on the public utility or common carrier affected thereby, by registered mail; and such order and decision shall become operative and effective within thirty days after such service, and such public utility or common carrier shall, unless an action is commenced in a court of proper jurisdiction to set aside the findings, orders and decisions of said Public Utilities Commission, or to review and correct the same carry the provisions of said order into effect.

"SEC. 20. Whenever any common carrier or public utility governed by the provisions of this act shall desire to make any change in any rate, joint rate, toll, charge or classification or schedule of charges, or in any rule or regulation or practice pertaining to the service or rates of any such public utility or common carrier, such public utility or common carrier shall file with the Public Utilities Commission a schedule showing the changes desired to be made and put in force by such public utility or common carrier, and such changes shall be plainly indicated by proper reference marks in amendments or supplements to existing tariffs, schedules or classifications, or in new issues thereof. No change shall be made in any rate, toll, charge or classification or schedule of charges, joint rates, or in any rule or regulation or practice pertaining to the service or rates of any such public utility or common carrier, without the consent of the commission, and within thirty days after such changes have been authorized by said Public Utilities Commission, then copies of all tariffs, schedules, and classifications, and all rules and regulations, shall be filed in every station, office or depot of every such public utility and every common carrier in this state, for public inspection.

"SEC. 41. The provisions of this act and all grants of power, authority and jurisdiction herein made to the commissioners, shall be liberally construed, and all incidental powers necessary to carry into effect the provisions of this act are hereby expressly granted to and conferred upon the commissioners."

It will be seen from the foregoing statutes that the legislature has promulgated a comprehensive program for the regulation and control of public service corporations. The public utilities commission, succeeding to all the powers conferred upon the state board of railroad commissioners, and by its own enlarged powers conferred by later enactments, has power to supervise the conduct of public service corporations in this commonwealth. It may order improvements in the public service where conditions so demand. (*The State v. Railway Co.*, 76 Kan. 467, 92 Pac. 606; affirmed in *Mo. Pac. Ry. Co. v. Kansas*, 216 U. S. 262; *The State v. Railway Co.*, 81 Kan. 430, 105 Pac. 704; *Railway Co. v. Railway Commissioners*, 85 Kan. 229, 116 Pac. 506; *The State, ex rel., v. Rail-*

*road Companies*, 85 Kan. 649, 118 Pac. 872.) Likewise an unreasonable order, such as one requiring the erection and maintenance of a railway station where there was no need for a station, will be corrected on judicial review. (*Railroad Commissioners v. Railway Co.*, 71 Kan. 193, 80 Pac. 53.) The rates of gas supplied by a public service company can not be changed without the consent of the public utilities commission. (*The State, ex rel., v. Gas Co.*, 88 Kan. 165, 127 Pac. 639, affirmed in *Wyandotte Gas Co. v. Kansas*, 231 U. S. 622.)

Examining these statutes, which are all *in pari materia*, it will be noted that the commission has power to inquire into any neglect or violation of law by a corporation engaged in the transportation of property. (Gen. Stat. 1909, § 7186.) The commission is given authority over additions or changes of stations and changes in the mode of conducting its business. (Gen Stat. 1909, § 7188.) It may be urged that at the time of the enactment of this statute, just cited, telegraph companies had not yet been specifically subjected to the control of the commission. Conceding that, the language is significant when read in the light of the later utilities act, the main purpose of which was to subject all public utilities to the same kind of control theretofore exercised over railroads.

Continuing this examination of later enactments, we find the commission vested with full power, authority, and jurisdiction to supervise and control the public utilities and common carriers, and empowered to do all things necessary and convenient for the exercise of the power, authority and jurisdiction. That is to say, whatever power is necessary to the effectual exercise of the specific powers conferred is likewise conferred. (Utilities act, Laws 1911, ch. 238, §§ 1, 41.) And section 2 of the utilities act virtually extends the power already given over railroads to all public utilities. Section 3 defines a public utility and specifically names a telegraph company as such.

By section 10 of the same act every common carrier and public utility is required to give reasonably efficient and sufficient service, and to make just and reasonable rules and regulations, and the commission is given power to require reasonably sufficient and efficient service to be maintained. Section 14 provides that any regulation, practice or act whatsoever affecting or relating to any service, is subject to super-

vision and control by the commission. Section 16 provides the procedure for changing the rules, regulations, practice, acts, etc., of the public utility companies, and is one of the many provisions for judicial review of the orders of the commission.

Section 20 also is quite pertinent. It provides that if a public utility desires to change any rule, regulation, or practice, it shall apply to the commission for leave to change such practice, etc. And no change in such practice, etc., shall be made without the sanction of the commission.

In view of all these, can there be any doubt of the duty of the defendant, before dismantling its station at Syracuse and abandoning its business thereat, to secure the approval of the commission for such an important change in its mode of service? How is the public utilities commission to discharge its important duties if the public service companies may quit business here, there, or anywhere in the state without an opportunity for the commission to determine the propriety of such a course?

It is clear that if the defendant may forego its business in Syracuse without the sanction of the commission, it can close its office in Topeka, Wichita or Kansas City without the consent of the commission. If this public utility, a telegraph company, can close one of its offices and quit business without the consent of the commission, any other public utility, like the Santa Fe railway for example, could close its depot at Dodge City, Hutchinson or Emporia without the consent of the commission. Where would this end? If these utility corporations may abandon this particular service without consent of the commission, may they not take off their passenger trains, take up and abandon unprofitable branch lines, change the fares and rates of transportation for passengers and freight or raise the charge for telegraph messages without the consent of the commission? These questions answer themselves. To yield approval to the contention of the defendant is to concede that the state's program for the regulation and control of public service corporations is ineffective; that the public utilities act has been enacted in vain.

(2) Neither do we discover the force of defendant's contention that section 20 of the utilities act is void as sought to

be applied to this case. What is it but a fair exercise of governmental authority, a method of procedure prescribed by law for the effective supervision of defendant's public service business? Let it be granted, as the demurrer does concede, that the maintenance of a telegraph station at Syracuse is unprofitable. All that was necessary for the defendant to do was to make application to the commission, setting up the facts. It would then be the duty of the commission to verify the facts by proper investigation; and if the alleged facts were true and no other lawful interest was materially affected, the commission would be bound to grant the application. If the commission failed to do so, the courts are open and mandamus or other appropriate remedy would speedily redress the telegraph company's situation. But here the telegraph company gave the commission no opportunity to investigate. Other cases may arise where it is a close and debatable question whether the telegraph station pays expenses and a fair profit. Moreover it should be borne in mind that a public service corporation may in a proper case be required to establish and maintain reasonable facilities for the effective discharge of its self-assumed duties, even if the revenues derived therefrom will not always reimburse the corporation for the expenses incurred. (*Atlantic Coast Line v. N. Car. Corp. Com'n*, 206 U. S. 1, 51 L. Ed. 933.)

Shall the public service company determine this matter itself, and without any governmental check of any sort? No argument can be made for the defendant on its right to close its Syracuse station without consent of the commission which could not with equal force be made in favor of its right to make any other change in its methods of conducting its business in this state without consent of the authority vested by law with supervision of its business. Suppose its rates for telegrams are too low and unprofitable. Could it raise these rates without applying to the commission for permission to raise them?

We recognize that officers of public service corporations have viewed with great misgiving the extension of governmental power over their business which has come about in recent years. But this extension of governmental power, this public supervision by state and interstate commissions, has probably come to stay. Public service companies will have to reorder

their affairs accordingly. These official commissions have entered a new field of governmental activity. With time and experience they will take a broad and rational view of their duties and responsibilities. In time the public service companies will learn to trust these commissions as fully as they do the courts. Indeed, these commissions are equipped for the expeditious dispatch of business in a manner which will be of great service to the public utility companies, and will supply a field which courts never were designed to fill. (*San Diego Land & Town Co. v. Jasper,* 189 U. S. 439; *The Minnesota. Rate Cases,* 230 U. S. 352.)

Counsel for defendant have furnished us an excellent brief. Their citations relate to decisions reviewing unreasonable orders of state commissions. They may be valuable hereafter and we note them here: *Delaware, L. & W. R. Co. v. Van Santwood,* 216 Fed. 252; *Oregon, R. R. & N. Co. v. Fairchild,* 224 U. S. 510; *Chi., B. & Q. Ry. v. Wisconsin R. R. Com.,* 237 U. S. 220; *Telegraph Co. v. Railroad Commission,* 74 Miss. 80, 21 South. 15; *Chicago, R. I. & P. Ry. Co. et al., v. State, et al.,* 24 Okla. 370, 130 Pac. 617; *Western Union Telegraph Co. v. State,* 31 Okla. 415, 121 Pac. 1069.

But all their arguments and citations amount only to this: If an application to the commission had been made, and the facts developed as shown in defendant's answer, and if the commission had denied the application, and the telegraph company had been compelled to ask relief from the courts, the brief of counsel would be very persuasive, and perhaps entirely convincing that the commission should be directed to grant the telegraph company's application and relieve it from the burden of maintaining its unprofitable office at Syracuse.

But we insist that the first official tribunal to have consideration of such matters is the public utilities commission.

In *The State v. Railway Co.,* 76 Kan. 467, 92 Pac. 606, 612, it was said:

"There is nothing substantial in the contention that the statute authorizes the court to try the whole controversy and make such orders as it may deem reasonable and just, and that the order, when reviewed and revised, becomes a judicial order. This court is not given authority by the act to make any rule, order, or regulation. Its authority is limited to the inquiry, whether the order already issued is reasonable and just." (p. 486.)

(3) There is another question in this case which needs attention, otherwise it might make some trouble in disposing of this controversy when it goes to the public utilities commission. Section 1796 of the General Statutes of 1909 (Laws 1893, ch. 152) provides:

"That every telegraph company or other corporation operating a telegraph line through the corporate limits of any county seat in Kansas is hereby required to establish and mantain a telegraph station at such county seat, with the usual facilities and appointments for the convenience of the public in sending telegrams during the business hours of each day."

Certain infirmities in this statute were pointed out in *Telegraph Co. v. Austin,* 67 Kan. 208, 72 Pac. 850. Some help in disposing of this question may also be drawn from reference to a number of important cases decided by the United States district court in this state in March, 1913, but not reported. These cases were numbers 1390-1394, in equity, brought by the Santa Fe railway and other railroads against the public utilities commission, and against the attorney for the commission (Mr. Justice Marshall) and against the writer, then attorney-general. The railroads sought an injunction to restrain the enforcement of the maximum oil rate law. (Laws 1905, ch. 353, Gen Stat. 1909, §§ 7163-7165.) The public utilities commission resisted the application for an injunction, contending that the maximum oil rate law had been repealed by implication by the later enactment of the public utilities law; that while the prevailing rates for transportation of oils could not be changed without the consent of the commission, this was because of section 30 of the utilities act and not by any remaining potency in the maximum oil rate law of 1905. Adopting this contention of the commission and the very able brief of Mr. Justice Marshall, then its attorney, the federal district court (Hon. John C. Pollock), denied the injunction and dismissed the cases.

And so here. The telegraph company was required to maintain its station at Syracuse, not on account of any remaining potency in the act of 1893, but because the public utilities act of 1911 had entirely superseded it, and that act dealt with conditions as it found them at the time of its enactment, crystallizing those conditions, rates, service, regulations and the like as they then prevailed, and made them subject to

change, alteration and amendment by order of the commission. The necessary inference is that important changes materially affecting or likely to affect the convenience of the public were not to be made without the approval of the public utilities commission, except as its orders might be corrected by the courts. We hold, therefore, that the act of 1893 will be no obstacle to the abandonment of the telegraph company's office at Syracuse if the public utilities commission shall see fit, in the exercise of its sound discretion and with due regard to the rights of the public and of the telegraph company, to sanction it. The powers of the commission are no less comprehensive in dealing with telegraph service at county seats than elsewhere.

Mandamus is asked to restore the telegraph station. Mandamus is a discretionary writ. It does not in all cases issue as a matter of course. In this case we think it proper to withhold it temporarily. The defendant will be given thirty days to file its application with the commission for formal leave to discontinue its Syracuse station. Failing to file such application, a peremptory writ of mandamus will issue directing the defendant to reëstablish its telegraph station at Syracuse and to maintain that station until its discontinuance is sanctioned by the proper authority. It is so ordered.