No. 19,800.

A. B. MOLLOHAN, *Appellee*, v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant*.

SYLLABUS BY THE COURT.

1. SHIPPING LIVE STOCK—*Privilege of Unloading En Route "To Test the Market"—Contract Preferential and Discriminatory*. Where cattle were billed and shipped from Belvidere to Peabody at the regular rates which had been published and filed with the public utilities commission, a special contract granting to the shipper the privilege of stopping the cattle at Wichita to test the market and to terminate the journey at that point if the market was satisfactory and to continue the transportation to original destination if the market was unsatisfactory was preferential and discriminatory and violated the railroad and utilities acts.

2. SAME—*Tariffs Filed with Public Utilities Commission Control*. Where the tariffs of the carriers filed with the public utilities commission specify the points at which live stock may be stopped in transit to test the market, any special contract enlarging that privilege which is not specified in such tariffs is void.

3. SAME. Before a special privilege to stop cattle in transit to test a market en route can be granted by a railroad company it is necessary that the tariffs and schedules pertaining thereto must be filed with the public utilities commission, and be open to all shippers on equal terms.

Appeal from Marion district court; ROSWELL L. KING, judge. Opinion filed January 8, 1916. Reversed.

*William R. Smith, Owen J. Wood,* and *Alfred A. Scott,* all of Topeka, for the appellant.

*C. M. Clark,* of Peabody, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: On March 1, 1913, A. B. Mollohan shipped eighty steers in three carloads from Belvidere to Peabody over the defendant's railroad under the usual shipper's contract on which was noted in writing the words "Wichita Privilege." These words meant that the shipper would have the privilege of stopping the cattle in Wichita for the purpose of testing the market and of terminating their journey at that point if he decided to sell the cattle there, and if the market was unsatisfactory the shipment should continue to the final destina-

tion set down in the shipper's contract. In addition to this notation on the billing, the plaintiff notified the conductor of the train in which the cattle were shipped that he desired the cattle unloaded at Wichita, and he went to Wichita on a passenger train to arrange feed and water for their reception.

The cattle were not unloaded at Wichita but dispatched directly through to Peabody, arriving at a late hour on Saturday night, where plaintiff, expecting to receive them at Wichita, had made no provision to receive them or provide feed. The cattle were negligently unloaded, being jammed in the chute and piled up and bruised. By long-distance telephone from Wichita the plaintiff managed to get his cattle taken to a near-by lot; but as there was no opportunity to have them returned to Wichita in time for market before the following Tuesday the plaintiff gave up that purpose and kept the cattle and brought this action for damages.

The damages which occurred in the unloading of the cattle at Peabody were eliminated by the district court because the plaintiff had neglected to give notice to the railroad company in writing before the cattle were removed from Peabody station. Such was one of the stipulations of the shipper's contract. The appellee complains of this, but brings no cross-appeal. Moreover, the decision of the district court on that point was correct. (*Railway Co. v. Theis,* 96 Kan. 494, 152 Pac. 619.)

This left as the sole ground of damages the failure of the railroad company to stop the cattle at Wichita in accordance with the special arrangement for the "Wichita Privilege," and in accordance with plaintiff's request to the conductor of the freight train.

To meet this issue, the defendant answered:

"That at the time the live stock mentioned and described in plaintiff's petition was shipped over the line of defendant's railway, the said defendant railway had on file with the Public Utilities Commission of the State of Kansas certain rules governing live stock contracts, and also general instructions concerning the privilege of markets; said circular having also been filed with the Interstate Commerce Commission and known as I. C. C. No. 6084, same being indorsed as Santa Fe System Circular No. 2213-A. That said circular was and is a part of Santa Fe Railway tariffs, both state and interstate, and contains all the rules in force at the time the shipment involved moved, concerning the privilege of markets and rules governing same; said circular and tariffs having been duly published by the defendant and placed on file, not only with said

Public Utilities Commission of the State of Kansas, with its consent and approval, but also posted in defendant's several stations in said state.

"With respect to stoppage of live stock at Wichita, the said circular reads:

### " 'WICHITA, KAN.

" 'Where through rates are published on Live Stock to Chicago, Ill., St. Louis, Mo., East St. Louis, Ill., East Ft. Madison, Ill., Rock Island, Ill., Kansas City, Mo., St. Joseph, Mo., Omaha and South Omaha, Neb., and where Wichita, Kan. (see Note), is in a direct line of transit between initial point of shipment and the above destinations, the privilege of stopping in transit at Wichita, Kan., for the purpose of permitting shippers to avail themselves of the market at that point may be allowed, subject to the following rules:

" 'NOTE.—Wichita, Kan., will be considered in direct line of transit where Hutchinson or Little River, Kan., are in direct line of transit.' . . .

"Defendant further avers that said rule and regulation above set out was in full force and effect at the time plaintiff's shipment of cattle moved over the defendant's line, and that the defendant had no authority to permit said live stock to have the privilege of the market at Wichita, and to have done so would have been in violation of the Public Utilities Law of the State of Kansas, making the defendant railway company subject to prosecution for penalties under the Public Utilities Act of this State."

From a judgment for plaintiff the defendant appeals, and its assignment of error is chiefly directed to questions pertaining to the defense just recited. The tariffs filed with the public utilities commission were excluded from the evidence and the following instruction asked by the defendant was refused:

"The jury is further instructed that under and by virtue of Chapter 238 of the Session Laws of Kansas for 1911, commonly known as the 'Public Utilities Act,' a railroad company operating in this state is required to file with the Board of Public Utilities schedules of its rates on freight, livestock, etc., with all privileges, such as unloading in transit, stop-overs, etc., and that to deviate from said schedule is discriminatory and is contrary to law.

"If you shall find from the evidence, therefore, that said schedules were duly and properly filed with said Interstate Commerce Commission and said Board of Public Utilities of the State of Kansas, and that said schedules did not permit cattle shipments originating at Belvidere, Kansas, and terminating at Peabody, Kansas, to be unloaded at Wichita, Kansas, while in transit, then I instruct you that the failure of said defendant to so unload said cattle at Wichita would not be an act of negligence or violation of contract on the part of said defendant, but that said contract in that regard would not be enforcible against said defendant, and said plaintiff cannot recover anything for said failure to so unload said cattle."

The district court gave an instruction which in effect recognized the validity of the "Wichita Privilege" and its incidents. Upon the correctness of this, the judgment depends.

In recent years the whole drift of state and federal legislation has been directed to stamp out all manner of special privileges heretofore extended by railroads to favored shippers. By acts of our own legislature all such practices are forbidden under drastic penalties. Among the provisions of our statutes to prevent this vice, it is required that all tariffs pertaining to intrastate railway carriage shall be filed with the public utilities commission, and the manifest purpose of this is that all shippers shall enjoy the same rates for the same services under similar conditions; and that no special service or privilege shall be extended to one shipper which is not open to all; and to that end wherever unusual privileges are extended the details and tariff charges pertaining thereto must be filed with the public utilities commission, and all these rates, services, privileges, etc., are subject to amendment, modification, approval or disapproval of the commission. A full discussion of this subject and of the pertinent statutes will be found in *Railroad Co. v. Utilities Commission*, 95 Kan. 604, 148 Pac. 667, and *The State, ex rel., v. Postal Telegraph Co.*, 96 Kan. 298, 150 Pac. 544.

While the rates between Belvidere and Wichita, Belvidere and Peabody, and Wichita and Peabody are not before us, we are bound to presume that the rate under which the plaintiff's cattle were shipped to Peabody was the rate lawfully published and filed with the public utilities commission. No rate was filed with the commission covering cattle transportation between Belvidere and Peabody with the "Wichita Privilege." The rates on file covered both state and interstate transportation, but that is of no consequence here, although this is a common and commendable practice since it tends to simplify the inherently complex subject of railroad rates and tariffs. The tariffs specified the conditions under which the "Wichita Privilege" would be accorded. By logic as well as law, shipments which did not move along the routes to the well-known markets named in the officially approved tariffs could not lawfully be given this privilege. Nor can there be any doubt that the right to stop a shipment of cattle in transit to test an intermediate market is a valuable privilege and does amount to

an advantage which ordinary shippers of cattle from Belvidere to Peabody do not enjoy.  It might be urged that such privilege is open to all shippers from Belvidere to Peabody.  That can not be since no tariffs to that effect are on file with the utilities commission.

Some federal decisions are in point.  The case of *Chicago and Alton Railroad Co. v. Kirby,* 225 U. S. 155, 56 L. Ed. 1033, is instructive.  The supreme court of Illinois had upheld a judgment in favor of a shipper who had sustained damages from the railroad's breach of a special contract to transport a carload of high-grade horses from Springfield, Ill., to New York City.  The special contract stipulated that the carrier would deliver the car at Joliet, Ill., in time to connect with a "horse special" over the Michigan Central and connecting lines to New York.  The supreme court of the United States reversed the Illinois court, holding that since the horses had been shipped at the regularly published rates, which did not provide for special privileges nor for expedited service or transportation on a particular train, and since Kirby was not required to pay any higher rate for the promised special service, the special contract and the privilege were violative of the interstate commerce act.

An analogous case was *Engemoen v. Chicago, St. P. M. & O. Ry. Co.,* 210 Fed. 896, where a contract by an interstate carrier to transport live stock to their destination within a limited time was void, unless authorized or provided by its published tariffs.

Section 7174 of the General Statutes of 1909 requires that all schedules of rates be filed with the public utilities commission.  Sections 7178 and 7181 forbid any departure from the regular rates and make it unlawful for any railroad company "to grant any special privileges to any person, firm or corporation, either in the way of a preference in furnishing cars, side-track facilities, sites for elevators, mills, or warehouses or any other form of preference, privilege or discrimination."  Section 7214 provides that "all concession of rates, drawbacks and contracts for special rates shall be open to and allowed all persons, companies and corporations alike."  Section 7223 subjects the carrier to a possible fine of $5000 for each violation of the foregoing provisions of the railroad act.

Hensley v. School District.

·· To the foregoing has been added the public utilities act of 1911 ·(Laws 1911, ch. 238), in which the legislature descended to ·great· particularity touching the necessity that all rates be published and· filed,· and that the established rates for like services be observed, and all preferential or discriminatory rates, ·service and the like are forbidden, under appropriate penalties. This abridgement of the railroad and utilities acts closely paraphrases sections 2, 3 and 6 of the interstate commerce act. (24 U. S. Stat. at Large, ch. 104, p. 379, and amendments, 4 U. S. Comp. Stat. of 1913, p. 3812, 3 Fed. Stat. Ann. p. 813, Fed. ·Stat. Ann., Supplement of 1914, p. 639; 1 Drinker, The Interstate Commerce Act, p. 6; Fuller, Interstate Commerce, p. 178.)

(See, also, Note on right of carrier to discriminate with respect to special or unusual service in 12 L. R. A., n. s., 506.)

In view of this, it seems imperative to hold that the "Wichita Privilege" was a special privilege which had been promised the plaintiff, and as such it was illegal; and the failure to accord the promised privilege at Wichita can not be the basis of an action for damages.

.This necessitates a reversal of this case, with instructions to set aside the judgment and to enter judgment for defendant. It is so ordered.