[No. 28124. Department One. January 6, 1942.]

OREGON-WASHINGTON RAILROAD & NAVIGATION COMPANY, *Appellant,* v. C. M. KOPP COMPANY *et al.,* *Respondents.*[1]

[1]Reported in 120 P. (2d) 845.

*Roy F. Shields, Bonsted & Nichoson,* and *Hamblen, Gilbert & Brooke,* for appellant.

*Rigg, Brown & Halverson* and *Paul M. Goode,* for respondents.

ROBINSON, C. J.—The plaintiff carrier brought this action to recover charges for the transportation of a carload of lettuce from Auburn, Washington, to Milwaukee, Wisconsin. Respondents sought, by cross-complaint, recovery of damages for alleged negligent delay in transporting the lettuce, and for failure to give notice of the accomplishment of a diversion order.

The evidence shows that the carload of lettuce was delivered to the carrier June 14, 1935, by Richman & Samuels, Inc., for shipment to New York under straight bill of lading which did not call for any re-icing. The car left Auburn June 14th at 6 p. m. Respondent C. M. Kopp Company (which company will hereinafter be referred to as Kopp) purchased the shipment, and on June 17th obtained from the carrier an exchange bill of lading designating that company as both consignor and consignee and changing the destination to Omaha, Nebraska.

On June 20th, Kopp filed with the agent of the carrier at Auburn (the car was then at Omaha, Nebraska) an order to divert or reconsign the shipment to Ginsburg-Landsburg Co., Inc., at Sioux City, Iowa. On June

21st at 2:25 p. m. (the car then being at Sioux City, Iowa, having arrived there June 21st, at 11:35 a. m.), Kopp filed an order with the agent at Auburn to divert or reconsign the shipment to Freeto-Buck-Johnson, Inc., at Chicago. On June 22nd, at 1:30 p. m., Kopp filed with the agent of the carrier at Auburn an order to divert or reconsign the shipment to itself at Milwaukee, Wisconsin, with this notation on the order:

"If ·car now in Chicago, or past diversion point to Milwaukee, disregard this diversion."

The car was diverted in accordance with these directions and reached Milwaukee June 24th, at 12:45 a. m. The consignee was not on hand to receive delivery. The carrier mailed a post card notice to the consignee (Kopp) at Milwaukee, notifying it of the arrival of the shipment, and also notified the agent of the carrier at Auburn of the arrival of the shipment at Milwaukee and that it was unclaimed by the consignee, and instructing him to notify the consignor. This notice was received by the agent June·25th, at 1:12 p. m.

Kelso, the agent, according to his testimony, immediately endeavored to get in communication with C. M. Kopp, the president of the C. M. Kopp Company, who was the only representative of the company at Auburn. He called his office over the telephone at 1:30 and 4 p. m., but he was not there. At 5 p. m., he went to his office and left a usual form of notice, notifying Kopp of the arrival of the shipment at Milwaukee and requesting instructions regarding its disposition. He went to his office again at 6 p. m. and left a note asking him to call him by telephone at the freight office. The next morning, June 26th at 8 a. m., he called Kopp's office by telephone. Kopp answered the phone and he told him that the car was at Milwaukee, and requested instructions. Kopp informed him that he would communicate with Milwaukee. The carrier also notified

the original consignor and consignee, Richman & Samuels, Inc., at New York.

On June 26th, the agent of the carrier at Milwaukee also sent Kopp a telegram notifying him of the arrival of the shipment at Milwaukee and requesting instructions. Actual notice of the arrival of the shipment at Milwaukee was received by Kopp June 26th, at 8 o'clock a. m. On June 26th, Kopp wired D'Amoure Brokerage Company, at Milwaukee, who apparently had been previously informed by Kopp that the carload of lettuce was moving over the Milwaukee road and could be stopped at Milwaukee in case there was a market there for the lettuce,

"Now there. Please inspect immediately. Make best offer. Advise regarding ice."

and, not receiving a response that day, sent a night letter that evening making similar requests. In response to the first telegram, D'Amoure Brokerage Company sent a night message:

"Sorry unable sell condition ripe divert elsewhere icing morning VQXAL."

Kopp, upon receiving this telegram, June 27th, informed the agent of the carrier at Auburn that, on account of the negligence of the carrier in not notifying it of the completion of the diversion or the arrival of the car at Milwaukee, it abandoned the shipment to the carrier. Several days later the carrier sold the lettuce for a small sum, the best price obtainable, and applied the proceeds on the freight bill.

Kopp testified that, on the afternoon of June 22nd, the day he placed the order to divert the shipment to Milwaukee, he requested Kelso, the station agent at Auburn, as a special favor, to make it plain to the express company at Portland that he would be advised if the diversion was accomplished, and that Kelso

promised to do so, and that he would have the information the following day, Sunday, the 23rd. He further testified that he explained to Kelso that he did not have a telephone at his home, but that he would be in Auburn all of Sunday and would go to his office periodically during the day, and that Kelso should leave a note under his door in case he received information that the diversion had been accomplished. He further testified that he remained in Auburn the whole of Sunday, June 23rd, and went to his office two or three times, but found no note from Kelso. The following day, June 24th, he called Kelso by telephone and Kelso informed him that he had received no word that the diversion order had been accomplished.

Tuesday, June 25th, he was gone from his office most of the day, but returned at 5 p. m., and found a note there from Kelso asking him to call Kelso over the telephone. He called the freight office, and Snyder, Kelso's assistant, answered the telephone and informed him that Kelso was anxious to get in touch with him. He did not call Kelso at his house. He had no idea that Kelso desired to communicate with him in connection with this shipment. He assumed that the car of lettuce had arrived in Chicago and had been sold by Freeto-Buck-Johnson, Inc.

Kelso called him on the telephone the morning of June 26th, and informed him that the car was in Milwaukee. He further testified that the lettuce should have been in good condition on June 26th, but he added that he did not know whether it was or not. He judged from the wire from D'Amoure that it was in good condition, but stated that "condition ripe" is hardly explanatory enough to tell much about it. He did not have the lettuce inspected by a government inspector, and there is no evidence of the condition the lettuce was in on June 26th. Kelso, the station agent, denied

that Kopp made any request to be notified of the accomplishment of the diversion order, and also denied that he had any conversation with Kopp over the telephone on June 24th.

The trial court found that Kopp did request that he be notified of the accomplishment of the diversion order, and further found that it was a customary practice of the railroad company to notify shippers of the accomplishment of diversion orders when requested to do so, and entered judgment for respondents for an amount which the court found to be the price Kopp could have obtained for the lettuce at Milwaukee had he received notice of the diversion order.

Appellant's contentions, in substance, are:

(1) That an undertaking by the carrier to notify the shipper of the accomplishment of a diversion order is a service or facility which must be provided for in the published tariff;

(2) That a custom of the carrier to notify shippers of the accomplishment of diversion orders when requested to do so cannot impose liability in a case of this kind;

(3) That the tariff rules relating to diversions and reconsignments, and particularly the rule requiring requests for diversions or reconsignments to be made or confirmed in writing, regulate the entire matter of diverting or reconsigning shipments, and that an oral agreement by the station agent to notify the shipper of the accomplishment of the diversion order is void;

(4) That the failure of the carrier to notify the shipper of the accomplishment of the diversion order was not the proximate cause of any loss which the shipper may have sustained.

The trial court apparently based its decision, that the shipper had the right to abandon the goods to the carrier and recover from the carrier the amount it

could have obtained for the goods in Milwaukee on June 24th had it received notice of the accomplishment of the diversion order, upon the ground that it was a customary practice of the carrier to notify shippers of the accomplishment of diversion orders when requested to do so. The court expressed the view that, because of this custom, there could be no discrimination between shippers.

The pertinent portion of subdivision 7 of § 6, Title 49 U.S.C.A., reads as follows:

" . . . nor shall any carrier . . . extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs."

■ The question presented is one of Federal law, and the decisions of the supreme court of the United States are controlling. *Southern R. Co. v. Prescott,* 240 U. S. 632, 60 L. Ed. 836, 36 S. Ct. 469.

■ A headnote to the court's opinion in *Chicago & Alton R. Co. v. Kirby,* 225 U. S. 155, 56 L. Ed. 1033, 32 S. Ct. 648, reads as follows:

"A shipper is presumed to know what the published rates are, and if they do not contain provisions for the special service guaranteed to him he must be taken as having contracted for a rate discriminatory in his favor."

We quote further from the text of the opinion:

"But the company, by entering into an agreement for expediting the shipment, came under a liability different and more burdensome than would exist to a shipper who made no such special contract.

"For such a special service and higher responsibility it might clearly exact a higher rate. But to do so it must make and publish a rate open to all. This was not done.

"An advantage accorded by special agreement which affects the value of the service to the shipper and its cost to the carrier should be published in the tariffs,

and for a breach of such a contract, relief will be denied, because its allowance without such publication is a violation of the act."

In so far as we know, the rule of that decision has not been modified by any subsequent decision. It seems unlikely that it will be, since a holding that such contracts are legal would make possible the discriminations which the statute was enacted to prevent.

■ Since it is admitted that the service for which Kopp alleges he contracted was not set out in the appellant's tariffs, the question gets down to this: Was the service of value to Kopp? Did the carrier's promise to render it impose a higher responsibility upon the carrier? If these questions are answered in the affirmative, the alleged contract is void, and no recovery can be had upon it. That they must be answered in the affirmative it seems to us is too plain to permit of argument or dispute.

It is strongly urged, however, that it was shown in the instant case that it was the carrier's custom to enter into agreements with shippers to notify them of the accomplishment of diversion orders, and that such service was afforded to all who applied for it. Hence, it is said that there was no actual preference to Kopp or discrimination in his favor, and that, therefore, the object and purpose of the Federal act were in no way thwarted.

We think that all argument along that line is foreclosed by the opinion of the supreme court in *Davis v. Cornwell*, 264 U. S. 560, 68 L. Ed. 848, 44 S. Ct. 410, in which the opinion was written by Mr. Justice Brandeis and reads, in part, as follows:

"*Chicago & Alton R. R. Co. v. Kirby*, 225 U. S. 155, settled that a special contract to transport a car by a particular train, or on a particular day, is illegal, when not provided for in the tariff. . . . . The contract to

supply cars for loading on a day named provides for a special advantage to the particular shipper, as much as a contract to expedite the cars when loaded. *It was not necessary to prove that a preference resulted in fact. The assumption by the carrier of the additional obligation was necessarily a preference.* . . . The paramount requirement that tariff provisions be strictly adhered to, so that shippers may receive equal treatment, presents an insuperable obstacle to recovery." (Italics ours.)

Respondents contend that the judgment of the trial court can be sustained on the ground that the carrier was negligent in not changing the name of the shipper on the way bill. But the evidence does not show that the fact that the name of the shipper was not changed on the way bill resulted in any prejudice to the shipper. The shipper received notice of the arrival of the merchandise at Milwaukee as promptly as it would have had its name appeared on the way bill.

Respondents also contend that the car was beyond the diversion point to Milwaukee at the time the diversion order was given. It appears that the car was at Bensenville, which apparently is a switching yard a short distance outside of Chicago, when diverted. For all that is shown by the evidence, this is the next diversion point to Milwaukee after the car leaves Sioux City.

Respondents also contend that the car was at Sioux City twenty-four hours longer than necessary. The car arrived at Sioux City June 21st, at 11:35 a. m., and was placed on a side track, and notice was given to the consignee, Ginsburg-Landsburg Co., Inc. The order to reconsign to Freeto-Buck-Johnson Co. at Chicago was given to the agent at Auburn June 21st, at 2:25 p. m. The car left Sioux City June 22nd, at 6:15 p. m., in a train, which, the evidence shows, was the first

available train out of Sioux City after receiving notice of the reconsignment order.

The judgment appealed from is reversed, and the cause remanded to the trial court for further proceedings not inconsistent with this opinion.

MAIN, STEINERT, BLAKE, and DRIVER, JJ., concur.

[1]Reported in 120 P. (2d) 855.