NATIONAL BEEF PACKING
COMPANY, Appellant,

v.

The ATCHISON, TOPEKA & SANTA FE
RAILWAY COMPANY, Respondent.

No. KCD 27303.

Missouri Court of Appeals,
Kansas City District.

March 29, 1976.

George M. Winger, William G. Levi, Kansas City, for appellant.

Daniel M. Dibble, Kansas City, for respondent.

Before TURNAGE, P. J., and WELBORN and HIGGINS, Special Judges.

ROBERT R. WELBORN, Special Judge.

National Beef Packing Company brought this action against The Atchison, Topeka & Santa Fe Railway Company to recover the sum of $11,274.40 (plus interest) which it claimed was the value of unreturned meat hooks loaned by National for use in shipment of its products over Santa Fe routes. The claim was based upon alleged contracts of bailment between plaintiff and defendant. A jury failed to agree upon a verdict. Thereafter, the trial court sustained defendant's motion for a directed verdict and entered judgment accordingly. Plaintiff appeals.

National Beef Packing Company ("National") is a corporation engaged in commercial slaughtering and meat packing business. Its principal business during the period here involved was in Kansas City, Kansas. The Atchison, Topeka & Santa Fe Railway Company ("Santa Fe") was one of several rail carriers the services of which were used by National in shipping its products.

Shipments by National originating in Kansas City, Kansas and handled by Santa Fe were made in refrigerated trailers supplied by Santa Fe. The trailers were loaded on railroad flat cars and delivered to destination by Santa Fe and connecting carriers. Frozen animal carcasses loaded by National into the trailers were suspended from detachable hooks which hung from rails in the trailer. Some hooks were longer than others, hence "long hooks" and "short hooks" were involved. The number of each type required for a shipment depended upon the type of carcasses involved.

When National planned a shipment via Santa Fe, a National employee would call a clerk at the Santa Fe freight station and request a trailer or trailers for a specified day and time and also request the number of meat hooks required to load the particular trailer. When Santa Fe had the necessary hooks they sent them in the trailer. If the number required was not available, they would send what they had. In numerous instances the trailer was sent with no hooks.

When the trailer arrived at National, the loading foreman would check the trailer and the number and condition of the meat hooks. If Santa Fe had furnished less than the necessary number, hooks to supply the deficiency were taken from a stock owned by National. The loading foreman told National's scaler the number of National hooks, if any, used for each load and the scaler would enter the number of such hooks on a hook bailment form which included the trailer number and the destination of the shipment.

The bailment form together with the scaler's record of the weight of the shipment went to National's billing clerk. The billing clerk prepared the bill of lading for the shipment. Whenever a hook bailment was involved, he wrote on the face of the bill of lading the number of long and short hooks furnished by National.

When the Santa Fe driver arrived at National to pick up a loaded trailer, he was given the bill of lading, the original of which he was required to sign and leave with National. Where a hook bailment was involved, he was also given two copies of the hook bailment form, the original of which he signed and left with National. The driver retained a duplicate copy of the hook bailment. (The record is silent as to what the driver did with the copy.)

The bailment contract was in the following form:

"In consideration of the delivery to bailee [Santa Fe] by bailor [National] of the following described property to be used by bailee to facilitate the shipment described in the upper right hand corner hereof:

"_____ Long Hooks at 60¢ each   $ _____
"_____ Short Hooks at 40¢ each  $ _____
"   *   *   *

"bailee agrees to return same to bailor, in as good condition as when received, ordinary wear and tear excepted, by delivery thereof to bailor's origin plant within 10 days from date thereof, and to obtain bailor's receipt for same on the duplicate of this form. It is further agreed that should bailee fail to so return the said property, bailor is entitled to bill bailee for value of the hooks and racks not so delivered and bailee agrees to remit without delay."

This litigation involves hooks supplied by National in this manner for Santa Fe shipments from December, 1967, to March, 1969. During that period, Santa Fe would accumulate hooks at its freight station and, based upon their records of the number they had been short in trailers furnished National, would from time to time send drums and barrels containing meat hooks to National in numbers ranging from some 200 to 3000 hooks.

National's billing clerk kept a record of the hooks so furnished by National and those so returned by Santa Fe. According to his record, for the period involved, Santa Fe was short on returns by 18,737 long hooks and 13 short hooks, of a total value of $11,247.40.

Sometime in March, 1969, Santa Fe drivers were directed to stop signing the hook bailment form on National shipments. National continued to prepare the bailment form which was used to record the hooks furnished on Santa Fe shipments. The hooks allegedly not returned on that system were part of National's original demand upon Santa Fe, but at trial, these hooks were eliminated from the claim.

The Santa Fe general freight agent in charge of its Kansas City, Kansas freight station testified that he consulted with National's general manager following receipt in January, 1970 of a demand upon Santa Fe from National for settlement of the hook account. According to the Santa Fe

agent, Santa Fe was "basically even" with National on hooks at that time. According to him, he had been unaware that Santa Fe drivers had been signing the National bailment form. When he learned of the practice in March, 1969, he told the drivers' supervisor that he "did not see how they could sign for something they had no idea what they were signing for." Apparently this observation was sufficient to put an end to their signing the bailment forms.

Santa Fe had a duly published tariff covering the return of meat hooks. Its basic provisions were:

"MEAT HOOKS AND RACKS:

"Rates named in this tariff on: . . .

"Meats . . . include transportation of and return to origin point named in this tariff without additional charge, Meat Hooks and/or Racks, used in transportation of the commodities enumerated above, in refrigerator trailers. Shipper must certify on the bill of lading and shipping order the number and size of Meat Hooks and/or Racks used for loaded movement.

" 'Bill of lading and/or shipping order (See Note 2) must be issued for the return movement of meat hooks and/or racks. Such document must show reference to the loaded movement of meat hooks and/or racks from the origin point named in this tariff, and must be tendered at the time the empty trailer is returned to the railroad. The return movement without additional charge will apply only via the carrier or carriers which transported the loaded movement and will be in the type of service most convenient to the carrier. The number and size of Meat Hooks and/or Racks on the return movement and the following certification must be shown on the bill of lading and/or shipping order covering the return movement.'

*   *   *   *   *   *

"NOTE 2.—Bill of lading and/or shipping order must show the origin line of loaded movement as consignee.

"CERTIFICATION

"This is to certify that . . . . . . . . . long Meat Hooks and . . . . . . . . . short Meat Hooks or . . . . . . . . . Meat Racks (Shippers load and count) as described herein moved inbound via . . . . . . . . . . . . . . . from . . . . . . . ., (Name of Carriers)   (Shipper) from . . . . . . . . . . . . . on Waybill No. . . . . . . . . . . dated (point of origin) . . . . . . . . . . in Trailer No. . . . . . . . . . .

"In the event empty trailers are returned to the railroad without Meat Hooks or Racks, the shipper, consignee or their agent must so certify on document furnished by carrier."

Santa Fe's position in the trial court and the basis of its motion for judgment, eventually sustained, was that the bailment contracts were incompatible with the tariff and that the terms of the tariff had not been complied with for the return movement of meat hooks. Respondent continues to support the trial court's action on such grounds and on the further ground that plaintiff did not show that the Santa Fe drivers had the authority to enter into the bailment contracts on behalf of Santa Fe. Appellant, of course, contends that the bailment contracts were valid and that its evidence made a jury issue on the apparent authority of the drivers.

On this appeal the parties are in agreement as to the binding effect of a tariff provision on the parties to an interstate shipment insofar as rates and services are concerned. Appellant contends, however, that the bailment agreements were not in violation of the terms of respondent's tariff and were, in fact, consistent with the tariff provisions. Appellant's contention is that, under the tariff, the carrier was obliged to effect the return of the meat hooks and that the bailment agreement complements or reiterates the obligation imposed upon the carrier by the tariff.

Quite clearly, the bailment contract, if given effect, would obligate the carrier either to return all meat hooks furnished by the shipper and employed in a shipment, or to reimburse the shipper for the agreed value of the hooks. On the other hand, the obligation assumed by the carrier under the tariff is merely to return to the shipper without charge all meat hooks employed in

a shipment and tendered for return shipment. Unless, as argued by appellant, the carrier is obliged to institute the return movement, the bailment contract would impose upon the carrier a greater obligation than that found in the tariff.

Appellant's argument is premised primarily upon the evidence that during the period in question the respondent did deliver to appellant several thousand meat hooks, accompanied by bills of lading prepared by respondent. However, these were not bills of lading for the carriage of the hooks from the destination of the original shipment or shipments. All of such bills of lading offered in evidence by appellant were for the movement of the hooks from respondent's Kansas City, Kansas freight office to appellant. This would be consistent with the terms of the tariff which require that, on the return shipment, the "origin line of loaded movement [must be shown] as consignee." Under such provision, respondent would accumulate meat hooks returned to it and transport them to the shipper under a bill of lading covering the movement from the carrier to the shipper. Such practice would not have constituted a construction by respondent of its tariff as requiring respondent to originate the bill of lading for the movement from the original consignee at the destination of the original shipment to the carrier at the point of origin of the shipment.

The requirement of the tariff that the bill of lading for the return "be tendered at the time the empty trailer is returned to the railroad" negatives any duty on the part of the originating carrier to prepare such document. The return of the empty trailer is originated by the consignee of the shipment, not the originating carrier. That carrier would not know what had been tendered in the way of meat hooks with the empty trailer.

Therefore, the obligation which respondent assumed under its tariff was to return, without charge, all meat hooks properly tendered for such purpose. The tariff did not amount to a guarantee on the part of respondent that all of the shipper's hooks would either be returned or the carrier would compensate the shipper for those unreturned. In attempting to so obligate the carrier, the bailment agreement would impose a heavier burden upon respondent than that found in its tariff.

"An agreement for the performance of any service in addition to, or differing from, that which the carrier is obligated to render or furnish under a particular rate specified in a tariff schedule constitutes an unlawful departure therefrom." 13 Am.Jur.2d Carriers, § 115, p. 653 (1964). This rule is based upon the provisions of the Interstate Commerce Commission Act, 49 U.S.C. § 2, § 3(1) (the Elkins Act) and § 6(7). The rule has been applied in a wide variety of cases. *Chicago & Alton R. Co. v. Kirby,* 225 U.S. 155, 32 S.Ct. 648, 56 L.Ed. 1033 (1912)—Contract for shipment to arrive at a particular time invalid under tariff requiring shipment to be completed in a reasonable time. *Davis v. Cornwell,* 264 U.S. 560, 44 S.Ct. 410, 68 L.Ed. 848 (1924)—Agreement to furnish cars on a specified date invalid when tariff required only due diligence to provide cars at time desired. *Cicardi Bros. Fruit & Produce Co. v. Pennsylvania Co.,* 201 Mo. App. 609, 213 S.W. 531 (1919)—Agreement to divert shipment invalid where tariff did not provide for diversion privileges. See also *Clemons Produce Co. v. Denver & R. G. R. R.,* 203 Mo.App. 100, 219 S.W. 660 (1920); *Southern Cotton Oil Co. v. Central of Georgia Ry. Co.,* 228 F. 335 (5th Cir. 1915); *Jarka Corporation of Baltimore v. Pennsylvania R. Co.,* 130 F.2d 804 (4th Cir. 1942); *Mollohan v. Atchison, T. & S. F. Ry. Co.,* 97 Kan. 51, 154 P. 248 (1916); *Oregon-Washington R. & Nav. Co. v. C. M. Kopp Co.,* 12 Wash.2d 146, 120 P.2d 845 (1942).

Appellant cites *Southern Pacific Company v. Miller Abattoir Company,* 454 F.2d 357 (3rd Cir. 1972), in support of its argument that the bailment agreement does not constitute a rebate or material variance from the tariff. In that case a shipper was allowed to set off against a carrier's claim for additional charges at a quarantine stop-

page, a claim for damages for breach of the shipping contract to give the shipper or consignee immediate notice of a quarantine stoppage. There was no discussion in the court's opinion of the relationship between the provision of the shipping contract relied upon by the consignee and the applicable tariff provision, if any. No contention was made that the shipping contract provision was invalid because of a conflict with or extension of tariff provisions. The court, in footnote 5 at page 360, did note expressly that the consignee's liability for the expenses on the quarantine stoppage was governed by the tariff, not the shipping contract. Inasmuch as no question was raised as to the validity of the provision of the shipping contract relating to notice, the case is not authority for the proposition for which it is cited by appellant.

Appellant contends that the bailment contracts were not invalid as a matter of law and that they can be so found as discriminatory only if they provide an undue preference. Appellant argues that there was no evidence in this case that the bailment contracts created an undue preference. The cases cited by appellant in support of this argument, *Gamble-Robinson Commission Co. v. Chicago & N.W. Ry. Co.,* 168 F. 161 (8th Cir. 1909), and *American Smelting & Refining Co. v. Union Pac. R. Co.,* 256 F. 737 (8th Cir. 1919), dealt with special charges or services not covered by applicable tariffs. Insofar as a special agreement would impose a greater liability than the tariff, the Supreme Court, in *Davis v. Cornwell,* supra, stated: "The contract to supply cars for loading on a day named provides for a special advantage to the particular shipper as much as a contract to expedite the cars when loaded. It was not necessary to prove that a preference resulted in fact. The assumption by the carrier of the additional obligation was necessarily a preference." 264 U.S. at 562, 44 S.Ct. at 410.

Judgment affirmed.

All concur.