No. 20,624.

THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant,* v. F. H. STANNARD & COMPANY, *Appellee.*

### SYLLABUS BY THE COURT.

1. INTERSTATE SHIPMENT—*Nursery Stock—Consignor Liable for Freight Charges.* A shipper who induces a railway company to transport a shipment of freight in interstate commerce is liable for the lawful freight charges thereon.

2. SAME—*Contract or Custom Between Shipper and Carrier Can Not Vary Published Interstate Rates.* Since the adoption of the interstate commerce act and its later amendments, it is unavailing as a defense to an action for the charges on an interstate freight shipment that the shipper had long been a patron of the railway company and had a special understanding and custom in his dealings with the company whereby the carrier was to be the agent of the consignee as to all ship-

ments delivered by defendant, and that he guaranteed the freight charges only upon condition that he should be promptly notified by the carrier if any consignee refused to accept a shipment and refused to pay the freight charges thereon.

3. SAME. All special arrangements, agreements, customs and understandings between individual shippers and interstate railroads, not open to all similar shippers on equal terms, nor on file with the interstate commerce commission nor sanctioned by that tribunal, are void, and a defense to an action for interstate freight charges based thereon is subject to demurrer or motion for judgment.

Appeal from Franklin district court; CHARLES A. SMART, judge. Opinion filed February 10, 1917. Reversed.

*William R. Smith, Owen J. Wood, Alfred A. Scott,* and *Harlow Hurley,* all of Topeka, for the appellant.

*Wilbur S. Jenks,* of Ottawa, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: The plaintiff sued for the freight charges on certain nursery stock shipped by defendant from Ottawa, Kan., to Chestnut Hill, Pa., consigned to the Andora Nursery Company. The latter refused to accept the shipment and declined to pay the freight charges.

The defendant filed a general denial, and answered further with a full statement of the transaction:

"That the plaintiff received such shipment as agent for the said consignee, The Andora Nursery Company and the Andora Nursery Company became primarily liable for the payment of the freight upon such shipment; that the defendant has been a patron of The Atchison, Topeka and Santa Fe Railway Company for many years and it has been the custom and understanding between the plaintiff and the defendant for the plaintiff to promptly notify this defendant whenever the consignee refused to accept or pay the freight on shipments and such was the contract between the plaintiff and defendant in this case, implied by law and the general custom of the said railway company and especially the general custom and understanding between the plaintiff and this defendant; that by reason of such agreement this defendant guaranteed the payment of the freight upon such shipment on the condition, implied by the long course of dealing between the plaintiff and defendant and the general custom and understanding of the parties in making the shipment and by implication of law, that the railway company should, with due diligence, notify this defendant in case such freight charges should not be paid.

"Fourth: Defendant says that such shipment was made on or about

46—99 KAN.

the 9th day of April, 1912, and arrived soon after at Chestnut Hill, Pa., that the said 9 boxes of trees so shipped were properly packed and were in good condition at that time and were of the value of $200.00; that the Andora Nursery Company refused to accept such shipment; that the plaintiff railway and its connecting lines had and retained the said shipment of nursery stock in its possession and had valid liens thereon for the amount of its freight charges; that the plaintiff and its connecting lines might have then sold the said nursery stock for a sufficient amount to have paid such freight charges or if said plaintiff or its connecting lines or agents had notified this defendant that the Andora Nursery Company had refused such shipment, this defendant could have sold the said nursery stock for an amount in excess of the said freight charges of the plaintiff and its connecting lines. Defendant says, however, that the said plaintiff and its connecting lines made no effort to collect such freight charges from the consignee; but retained said shipment of nursery stock in its possession for many weeks after its arrival at Chestnut Hill, Pa., and after refusal of the Andora Nursery Company to receive the same and until it was too late to plant nursery stock for that season and the said nursery stock thereby became entirely worthless; that the plaintiff and its connecting lines knew the nature of said shipment; that it was nursery stock and that the same would become valueless if it was so retained by it without notifying this defendant; that it has not been possible for this defendant to collect the amount of said freight charges from the Andora Nursery Company at any time since receiving notice from the plaintiff that such freight charges had not been paid; that by reason of all the premises, this defendant was released from any guaranty of said freight charges or any liability therefor."

Plaintiff's demurrer and its motion for judgment on the pleadings were orverruled, and the correctness of these rulings is the subject of this appeal.

The rights and liabilities of the parties to this shipment are governed by federal law and the rules promulgated by the interstate commerce commission. We find no sanction in either for the first proposition urged in defendant's answer—that the railway company received the shipment as the agent of the consignee and that the latter is primarily liable for the freight charges. At common law the relations of the carrier, shipper and consignee were left largely to their private agreements, which were usually evidenced by their bills of lading and shipping contracts. Prior to 1887 these matters had received little legislative attention from congress, and in dealing with controversies arising over interstate shipments the courts interpreted the contracts of the parties and generally applied the principles of the common law. Since the adoption of the

interstate commerce act of 1887, however, and especially by its later amendments, much of the old law and many of the old decisions have been superseded. (*Kirby v. Railroad Co.*, 94 Kan. 485, 489, 490, 146 Pac. 1183; *Railroad Co. v. Utilities Commission*, 95 Kan. 604, 618-620, 148 Pac. 667.) Formerly the defense pleaded in this case might be a bar to plaintiff's action. It is otherwise now. Before the plaintiff could enter into an understanding with the defendant to receive the shipment of trees as the agent of the consignee and to look primarily to the latter for its compensation, it would be neces-sary for the railway company to promulgate a tariff rule to that effect and to file that rule with the interstate commerce commission. (*Mollohan v. Railway Co.*, 97 Kan. 51, 56, 154 Pac. 248.) That body might approve or disapprove the rule. Nor is it likely that such a rule would be approved unless it was framed in terms applying to all shippers alike, or at least applying to all shippers engaged in the distribution of nursery stock in some general and reasonable classification which would not offend against the anti-discrimination features of the interstate commerce act.

Section 3 of the federal act, in part, reads:

"That it shall be unlawful for any common carrier subject to the provisions of this act to make or give any undue or unreasonable preference or advantage to any particular person, company, firm, corporation, or locality, or any particular description of traffic in any respect whatsoever." (24 U. S. Stat. at Large, ch. 104, § 3, p. 380.)

Section 6 reads, in part:

"That every common carrier subject to the provisions of this act shall file with the commission created by this act . . . schedules showing all the rates, fares, and charges for transportation. . . . The schedules . . . and . . . all privileges or facilities granted or allowed and any rules or regulations which in any wise change, affect, or determine any part or the aggregate of such aforesaid rates, fares, and charges, or the value of the service rendered to the passenger, shipper, or consignee. . . . The provisions of this section shall apply to all traffic, transportation, and facilities defined in this act. . . . No change shall be made in the rates, fares, and charges or joint rates, fares, and charges which have been filed and published by any common carrier in compliance with the requirements of this section, except after thirty days' notice to the commission and to the public published as aforesaid. . . . Every common carrier subject to this act shall also file with said commission copies of all contracts, agreements, or arrange-

ments with other common carriers in relation to any traffic affected by the provisions of this act to which it may be a party.

"The commission may determine and prescribe the form in which the schedules required by this section . . . shall be prepared and arranged and may change the form from time to time as shall be found expedient. . . . Nor shall any carrier charge or demand or collect or receive a greater or less or different compensation . . . than the rates, fares, and charges which are specified in the tariff . . .; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares, and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs." (24 U. S. Stat. at Large, ch. 104, § 6, p. 380, as amended, 4 U. S. Comp. Stat. 1913, p. 3829, § 8569.)

The alleged special arrangements between the defendant and the railway company whereby the latter received the shipment as agent of the consignee, and that the defendant, through an understanding and custom of many years, was to be promptly notified whenever the consignee refused to accept shipments and pay freight, and that it was by reason of this understanding and custom that the defendant had guaranteed the freight, etc.—all these matters come fairly under the ban of the act just quoted. If this needs to be made still more clear, let us suppose that there were two nursery firms in Ottawa, Kan., the defendant and a competitor, and that both shipped trees far and wide by interstate railroads, and suppose the defendant's competitor had no such understandings with the plaintiff railway company as those pleaded in defendant's answer. In such case defendant's competitor would be liable for the freight on all shipments refused by its consignees while the defendant would be exempt under the arrangements pleaded in its answer. This would amount to such discrimination and favoritism that it would soon drive the defendant's competitor out of business. To do away with such discrimination and favoritism was one of the chief purposes of the interstate commerce act.

As we understand the interpretation of the interstate commerce act and the rules and orders promulgated by the interstate commerce commission pursuant to its terms, a railway company has no choice but to demand the freight charges from the shipper if they are not paid by the consignee, and the railway company is required to exhaust its legal remedies

Railway Co. v. Stannard & Co.

before the unpaid freight charges can be charged off to "loss and gain."

No. 314, Conference Rulings of the Interstate Commerce Commission, dated May 1, 1911 (Bulletin No. 6) issued April 1, 1913, reads:

"The law requires the carrier to collect and the party legally responsible to pay the lawfully established rates without deviation therefrom. It follows that it is the duty of carriers to exhaust their legal remedies in order to collect undercharges from the party or parties legally responsible therefor. It is not for the Commission, however, to determine in any case which party, consignor or consignee, is legally liable for the undercharge, that being a question determinable only by a court having jurisdiction and upon the facts of each case." (Watkins on Shippers & Carriers, 2d ed., p. 896.)

There can be no distinction in principle between the carrier's duty to collect an undercharge and its duty to collect the entire charge.

The situation of the railroad is not unlike that of a public tax collector. If a tax is not paid a tax warrant must issue, and the processes of law must be set in motion one after another so long as there is the slightest chance to collect it.

Whether the shipper or the consignee is primarily liable between themselves for the freight charges is no concern of the railway company. Since the shipper is the person who deals with the railway company and the one who induces the carrier to perform the transportation service, he is liable absolutely. (*Portland Flouring Mills Co. v. British & F. M. Ins. Co.*, 130 Fed. 860; *Baltimore, etc., R. Co. v. New Albany Box, etc., Co.*, 48 Ind. App. 647; *Baltimore & Ohio Railroad Co. v. LaDue,* 128 App. Div. 594, 598; 2 Moore on Carriers, 2d ed., p. 669.) The consignee is liable if he accepts the shipment; otherwise, except under special circumstances, he is not. If by chance the consignee is also the shipper he is liable of course, and the same would be true if the consignor were merely the agent of the consignee. But the fact that he is the consignee as well as the shipper is not the controlling point. It rests on the fact that he is the shipper.

Even the latest textbooks on this general subject must be read in the light of recent federal legislation, most of which tends to modify the textbook doctrines, yet some of them are still helpful.

In 4 R. C. L. 857, it is said:

"Ordinarily a carrier has a right to look for his compensation to the person who required him to perform the service by causing the goods to be delivered to him for transportation, and that person is generally of course the shipper named in the bill of lading, or the consignor. The fact that the latter does not own the goods has been held [im]-material, on the ground that the carrier's contract and right to recover his freight can not be made to depend on what may prove to be the legal effect of the negotiations between the consignor and the consignee on the title to the property which is the subject of transportation. Furthermore, even though there is a stipulation in a bill of lading providing that the consignee shall pay the freight, that does not of itself relieve the consignor, and a carrier is not bound at his peril to enforce the payment of freight from the consignees."

In 6 Cyc. 500, it is said:

"In general the consignor with whom the contract of shipment is made is liable under the contract for the charges provided for therein. And this liability exists regardless of whether the consignor is the owner, and irrespective of the failure of the carrier to collect freight from the consignee. In general also the owner of the goods for whose benefit and under whose direction they are shipped is liable for the freight. As the carrier is in general entitled to freight from the consignee as a condition of delivering the goods, the consignee who actually receives the goods is liable for freight, although it may not have been exacted before delivery."

In 2 Hutchinson on Carriers, 3d ed., § 810, it is said:

"But the remedy against the consignee is not exclusive, although he may be the owner of the goods . . . So far as the carrier is concerned, the consignee will be considered as merely the agent of the shipper to pay the freight, and if he fails to pay it the party who has reposed the confidence must take the consequences of the breach of duty. It will alter none of the rights of the carrier, to whom the shipper became bound for the freight as soon as the goods were delivered for carriage, unless the carrier has entered into a new contract with the consignee, by which he may forfeit his right to resort to the consignor." (See, also, Note in Ann. Cas. 1916 E, 378.)

The fourth paragraph of defendant's answer admits that the shipment was promptly carried to destination. The loss and damage to the trees arose after the transportation had been properly and timely accomplished. The only basis for charging the railway company for the loss and damage— as a setoff, if such it be—rests upon its failure to notify the defendant shipper that the consignee had refused to accept the goods. As this is founded on the special understanding and

custom between the railway company and the defendant, manifestly a discriminatory and special privilege if it existed, it is no defense at all.

We do not think it proper to decide this lawsuit on the technical question presented as to the sufficiency of the bill of freight charges attached to plaintiff's petition, nor on the want of a verification to defendant's answer. The petition alleged all the pertinent facts even if no statement of account had been attached to it. The answer also pleaded all the pertinent facts and the pleaded defense to the action was insufficient in law to meet it. This requires that the judgment of the district court be reversed with instructions to sustain the demurrer to defendant's answer, and to enter judgment on the pleadings in favor of plaintiff.