Railway Co. v. Wagner.

No. 21,443.

THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY,
*Appellant*, v. H. WAGNER, *Appellee*.

SYLLABUS BY THE COURT.

1. INTERSTATE COMMERCE—*Bill of Lading—Acceptance by Consignee—
Implied Contract to Pay Established Freight Rates.* Where an inter-
state bill of lading contains any provision authorizing the consignee to
pay the freight, an implied contract by the consignee to pay the freight
charges arises from his acceptance of the delivery of the goods under
the bill, into which contract there will be read the provisions of the
Elkins act requiring payment of the full charges in compliance with
the duly established rate; and where the consignee pays the charges
demanded, which are less than the established rate, the carrier may
maintain an action against him for the unpaid balance of the legal
charges.

2. SAME—*Presumption that Schedule of Rates Was Duly Published.* In
a suit by a carrier to recover from a consignee the unpaid balance due
for freight charges, where it is admitted that a schedule of rates has
been duly filed with and approved by the interstate commerce commis-
sion, the presumption, in the absence of any showing to the contrary,
is that the rates were duly published, and not that the carrier has vio-
lated the provisions of the Elkins act subjecting it to severe fines
and penalties for failure to publish the same.

Appeal from Chase district court; WILLIAM C. HARRIS,
judge. Opinion filed April 6, 1918. Reversed.

*William R. Smith, Owen J. Wood,* and *Alfred A. Scott,* all of
Topeka, for the appellant.

*Charles E. Davis,* of Cottonwood Falls, *R. M. Hamer,* and
*H. E. Ganse,* both of Emporia, for the appellee.

The opinion of the court was delivered by

PORTER, J.: The appellant sues to recover an undercharge
of freight amounting to $34 on a car of cottonseed cake shipped
from Bastrop, La., to Bazaar, Kan., and delivered to the appel-
lee who was the consignee. The agreed statement of facts upon
which the case was submitted to the court is, that the appellant
and its connecting lines upon which the shipment was handled
had filed with the interstate commerce commission a schedule

of rates which had been approved, and which required the payment of $114 on this shipment; that the charges actually paid by the appellee were $80; that the merchandise was consigned shipper's order, and appellee was to receive it at Bazaar, freight paid by the consignor; that he accepted delivery and at the request of the consignor paid the $80, which was the full amount of charges demanded by the appellant, and remitted the balance of the purchase price of the merchandise to the consignor. Upon these facts the court rendered judgment against appellant for costs and overruled a motion for a new trial.

Two reasons are suggested by the appellee in support of the judgment. The first one to be noticed is the claim that the appellant was not entitled to recover, because there was no showing that it had caused the rate filed with the commission to be published. On the other hand, the appellant relies upon the presumption that it took all the necessary steps required by law in establishing the rate. By the Elkins act of February 19, 1903, Part I, 32 U. S. Stat. at Large, 847, a willful failure of the carrier to publish the tariff of rates and charges as filed is made a misdemeanor, and the act declares that upon conviction "the corporation offending shall be subject to a fine not less than one thousand dollars nor more than twenty thousand dollars for each offense."

In *Cincinnati & Tex. Pac. Ry. v. Rankin*, 241 U. S. 319, it was said:

"It cannot be assumed, merely because the contrary has not been established by proof, that an interstate carrier is conducting its affairs in violation of law." (p. 327.)

(See, also, *New York Central &c. R. R. v. Beaham*, 242 U. S. 148.)

We think the presumption is one upon which the appellant was entitled to rely until it was met by some evidence to the contrary. Besides, the contention is technical; there is no claim that the facts, if shown, would disclose that the schedule of rates had not been duly published. In *Railroad Co. v. Thisler*, 90 Kan. 5, 133 Pac. 539, some countenance was given to the technical rule which the appellee is now invoking, but there the cause was sent back for a trial of the sole question whether the rate had been duly published. The effect of

the presumption that the railway company had not violated the penal statutes was not referred to in the opinion.

The principal contention of the appellee is that the judgment should be sustained because the consignee is not primarily liable for the freight charges, and only becomes liable at all by reason of his acceptance of the shipment; and that the extent of his liability in this case was to pay the amount demanded by the carrier. There are a number of authorities which sustain the contention. The supreme court of Alabama, in *Central of Georgia Ry. Co. v. Southern Ferro Concrete Co.*, 193 Ala. 108, reported with a note in A. & E. Ann. Cas. 1916E 376, held,

"That the mere acceptance and removal of the goods by the consignee, with the knowledge that the carrier is giving up a lien upon the goods for a stated amount, does not create an obligation on the part of the consignee to pay the charges beyond the amount stated. [Citing Hutchinson on Carriers, and *Central R. Co. v. MacCartney*, 68 N. J. L. 165.]" (p. 378.)

A number of cases are cited in the note above referred to which are to the same effect. In one of the cases (*Pennsylvania R. Co. v. Titus*, 156 App. Div. 830, 142 N. Y. Supp. 43) the reasons stated seem, at first glance, persuasive. We quote from the opinion:

"Of course, if the consignee accepts the goods, with notice that the carrier has a lien for a specified amount, thereby depriving the carrier of its lien, he becomes obligated by an implied contract to pay the charges. . . . But if the carrier induces him to accept the goods on the theory that the freight charges are as stated, there is no principle upon which he thereby becomes liable to the carrier for the difference between the freight charges thus paid and those which the carrier by law was required to charge." (p. 833.)

These cases concede the rule that, generally, the carrier may look either to the consignor or the consignee for payment of the freight charges, but draw a distinction between a case where the consignee accepts the shipment with knowledge of the undercharges (in which case he is held liable because his act deprives the carrier of its lien on the goods), and those where he is induced to accept the goods on the theory that the freight charges are correctly stated by the carrier. As between the consignee and the carrier the reasoning would appear perfectly sound; but over and above the rights of either

the consignee or the carrier are the rights of the public, which require that all shippers shall be treated alike. We think the decisions quoted lose sight of the policy of the Elkins act, which compels the carrier in every instance to collect the full amount of the established rate, and which in effect makes the consignee who receives the goods, for all purposes the owner and liable to the same extent as the consignor. To hold otherwise would merely open a door to evasion and unjust discrimination. We may not lose sight of the fact that the carrier does not usually bring actions of this character for the mere purpose of collecting the undercharge, but because the law imposes upon him a severe penalty in case he fails to use every means the law affords to collect the undercharge. In *New Haven R. R. v. Interstate Commerce Com.*, 200 U. S. 361, the present Chief Justice said in the opinion:

"It cannot be challenged that the great purpose of the act to regulate commerce, whilst seeking to prevent unjust and unreasonable rates, was to secure equality of rates as to all and to destroy favoritism, these last being accomplished by requiring the publication of tariffs and by prohibiting secret departures from such tariffs, and forbidding rebates, preferences, and all other forms of undue discrimination. . . . The all-embracing prohibition against either directly or indirectly charging less than the published rates shows that the purpose of the statute was to make the prohibition applicable to every method of dealing by a carrier by which the forbidden result could be brought about." (pp. 391, 392.)

In *Armour Packing Co. v. United States*, 209 U. S. 56, it was said in the opinion:

"It is not so much the particular form by which or the motive for which this purpose was accomplished, but the intention was to prohibit any and all means that might be resorted to to obtain or receive concessions and rebates from the fixed rates, duly posted and published." (p. 72.)

To the same effect see *Railway Co. v. Stannard & Co.*, 99 Kan. 720, 162 Pac. 1176; an action, however, to correct undercharges from a consignor.

The law is well settled that where the bill of lading contains any provision authorizing the consignee to accept the goods and pay the freight an implied contract by him to pay the charges arises from his acceptance of the delivery. The contract is implied "because the consignee knows that the carrier looks to him for the charges and by delivery waives his lien

therefor, in the faith that the consignee will pay them."
(*Union Pac. R. Co. v. American Smelting & Refining Co.,*
202 Fed. 720, syl. ¶ 1, and cases cited in the opinion.)

We think that. in all interstate shipments the Elkins act
must be read into the implied contract of the consignee, and
that the contract must be held as obligating him to pay the full
amount of the legally established rate. In the case last cited
the consignee paid less than the legal charges. It was said in
the opinion: "The legal presumption is that the plaintiff in-
tended to charge, and the defendant intended to pay, a legal,
and not an illegal, amount for this transportation." (p. 722.)

In *Texas & Pacific Railway v. Mugg,* 202 U. S. 242, the syl-
labus reads:

"One obtaining from a common carrier transportation of goods from
one state to another at a rate specified in the bill of lading, less than the
schedule rates published and approved and in force at the time, whether
he does or does not know the rate is less than schedule rate, is not en-
titled to recover the goods, or damages for their detention, upon tender-
ing payment of the amount specified in the bill of lading, or of any sum
less than the published charges. Whatever may be the rate agreed upon,
the carrier's lien on the goods is, by force of the Interstate Commerce
Law, the amount fixed by the published schedule of rates and charges,
and this lien can be discharged, and the consignee becomes entitled to the
goods, only by payment or tender of such amount."

The effect of the Elkins act appears to be that it makes the
consignee who accepts the shipment, the owner for all pur-
poses and liable to the same extent as the consignor.

The judgment is reversed, and the cause is remanded with
directions to render judgment for the appellant.

WEST, J. (dissenting) : The petition alleged that the freight
charges which should have been legally collected, based on a
certain rate as shown by the published tariffs on file with the
interstate commerce commission, "and in force and effect and
controlling as a legal rate," were those sued for. If this be
deemed equivalent to an allegation that the posting had been
properly made because otherwise the tariff could not have been
in effect as alleged, it was met, however, by the verified general
denial of the defendant, and there was nothing in the agreed
statement of facts amounting to an admission that the alleged
rate was posted or in effect. In the Thisler case it was ex-

pressly denied that the rates had been filed as required by law, and also expressly denied that any of the railroads concerned "had caused any schedules to be printed and copies for the use of the public posted or kept accessible to the public as required by law." This denial was ignored in the instructions, and the cause was remanded upon the sole question as to whether or not the rate sought to be recovered was legally in force.

There is nothing in the cited Rankin case inconsistent with the Thisler decision. Rankin had signed a bill of lading which recited that lawful alternate rates based on specific values were offered, and the court said:

"And as no interstate rates are lawful unless duly filed with the Commission, it may become necessary for the carrier to prove its schedules in order to make out the requisite choice. But where a bill of lading, signed by both parties, recites that lawful alternate rates based on specific values were offered, such recitals constitute admissions by the shipper and sufficient *prima facie* evidence of choice. If in such a case the shipper wishes to contradict his own admissions, the burden of proof is upon him." (*Cincinnati & Tex. Pac. Ry. v. Rankin*, 241 U. S. 319, 327.)

It was further observed that the bill of lading contained "the conspicuous provisions concerning published rates, tariff regulations. . . ." (p. 328.) The state courts had given no force to this bill of lading, and hence the reversal.