No. 26,930.

W. J. FARRAR, *Appellant*, v. FRED PERKINS, *Appellee*.

SYLLABUS BY THE COURT.

1. CARRIERS—*Freight Charges—Compromise of Bill is Void.* A compromise of a bill of freight charges on an interstate shipment of live stock for less than the regularly published and lawful tariff rate was void as against public policy and in breach of the inhibitions of the interstate commerce act.

2. SAME—*Freight Charges—Compromise and Partial Payment by Agent—Reimbursement.* Defendant took from the railway, at Oswego, nine carloads of lambs which had been shipped from California. He declined to pay the freight charges on the excuse that his private contract with the consignor provided that the latter would pay the carrier's charges. Later, out of affected consideration for the plaintiff, whose position as the railway station agent was imperiled by the noncollection of the freight charges, defendant effected a compromise and settlement with plaintiff whereby each agreed to and did contribute one-half of the amount due the railway company. *Held,* the compromise and settlement were void, and the plaintiff having satisfied the railway company's charges in full is entitled to reimbursement from defendant.

3. SAME—*Freight Charges—Who Liable—Party Accepting Shipment Assuming Ownership.* One who accepts a shipment of property from a railway carrier in assumption of ownership and of right thereto, cannot escape the

Carriers, 10 C. J. pp. 446 n. 31, 511 n. 89; 24 A. L. R. 1167; 4 R. C. L. 858.

responsibilities of a consignee merely because he was not so designated in the bill of lading or because of the want of a bill of lading altogether.

4. SAME—*Generally.* Certain matters urged in support of the judgment of the trial court considered and disapproved.

Appeal from Cherokee district court; FRANK W. BOSS, judge. Opinion filed December 11, 1926. Reversed.

*Charles Stephens, F. E. Dresia* and *Hubert Horning,* all of Columbus, for the appellant.

*Archie D. Neale,* of Chetopa, for the appellee.

The opinion of the court was delivered by

DAWSON, J.: This action, which was here before on a question of the sufficiency of the petition (116 Kan. 374, 226 Pac. 714), was brought by plaintiff, W. F. Farrar, formerly station agent at Oswego for the Missouri, Kansas & Texas Railway Company, against defendant, Fred Perkins, to recover a balance due as freight charges on nine carloads of lambs (2,600 head) which were shipped by one Pitman from California to Oswego, and received and taken from the custody of the railway company, and this plaintiff, as its agent, on November 10, 1920, by this defendant, without payment of the proper freight and feed charges thereon, some $3,918.78.

The shipments had not been prepaid, and defendant surrendered no bill of lading in receipt for the lambs. He merely sent his employees to the stock pens of the railway company, into which they had been unloaded from the stock cars, and took possession of the lambs and drove them away. Within a day or two, plaintiff as station agent for the railway company, sent a messenger to collect the charges. Defendant refused to pay on the pretext that he was not the designated consignee, and that the consignor Pitman had promised defendant that he, Pitman, would pay the transportation charges.

The railway company chose to hold plaintiff responsible for the uncollected freight charges rather than to adopt its agent's grievance as its own and take upon itself the burden of collecting its due from defendant. The matter hung fire for several weeks, from November 10, 1920, until February 17, 1921, while plaintiff tried to induce defendant to pay. Defendant tried to get the consignor to pay, and the railway company threatened plaintiff with the loss of his job unless payment was forthcoming. Eventually on February 17, 1921, defendant agreed to and did pay half the freight bill and plaintiff

Farrar v. Perkins.

himself furnished the other half of the money. Thus the railway company received its due, whereupon it promptly discharged the plaintiff from its service.

Plaintiff brought this action, alleging the foregoing facts and other incidental matters of no present concern.

Defendant filed a lengthy answer, which contained a general denial, and among other matters pleaded that if any bill of freight charges was due it was by Pitman the consignor and not by defendant; that the payment of one-half the freight bill by defendant was merely to protect the plaintiff to that extent, and that a contract of settlement, exhibit A, was effected between the plaintiff and defendant, and—

"The defendant avers that at no time was he indebted to the receiver of said railroad for any freight or other transportation charges, which fact was well known to the plaintiff herein; that he advanced said money to plaintiff personally, at the request of the plaintiff, and for his accommodation, and with the understanding and agreement that said money was to be refunded to him upon the collection of the same from the said Pitman. . . .

"Defendant avers that said written agreement was a compromise agreement, made for the purpose of settling and adjusting a disputed claim; was made in good faith, and with a fair and full understanding of the facts and circumstances surrounding the whole transaction by both parties thereto. . . .

"Defendant avers that the said sheep were billed to one —— Pitman, at Kansas City, Mo., with permission to unload at Oswego, Kan.; that at the time of the delivery of said sheep to defendant by the said Pitman at Oswego, Kan., defendant had, in bank in Texas and was retaining the same until after the delivery of the sheep and adjustment of all claims, if any, against them, the sum of about $3,000, money of the said Pitman, when he had fully complied with the terms of his contract with defendant; that said money was held for such purpose until more than ten days after the said sheep were delivered to defendant, and that during said ten days plaintiff made no demand upon defendant for any freight charges, and defendant knew nothing about any claim for such alleged charges; . . .

"Defendant further avers that at the time of the said signing of the said written agreement, copy of which is attached to the last amended petition, marked 'Exhibit A,' the plaintiff was the agent of the receiver of the Missouri, Kansas & Texas Railroad Company, at Oswego, Kan., and had full power and authority, as such agent, to collect any and all freight due the said receiver of said railroad company, and to settle and adjust claims for freight due the said receiver.

"That on the 17th day of February, 1921, the said plaintiff, as the duly authorized agent of the said receiver, demanded of and from defendant freight on a certain shipment of sheep, in the sum of $3,918.78; that the defendant then informed plaintiff that he did not owe anything for freight on sheep, and then declined to pay the same. That after some negotiations between the

plaintiff and the defendant the defendant said to plaintiff, in substance, that rather than have litigation he would pay to plaintiff, on account of such alleged freight, the sum of $1,859.39, in full payment and discharge of all claims against him on account of such freight; that after some conversation the plaintiff agreed to accept from defendant the said sum of $1,859.39 in full payment and satisfaction of said alleged claim, and the defendant agreed to and did pay to plaintiff said sum of money, and said contract was signed and accepted by both parties, in full payment and satisfaction of said alleged disputed claim, and the matter was fully closed.

"That no fraud was practiced in the signing of the said contract; no duress in the signing thereof, but the same was signed freely, with a perfect understanding and agreement of all the facts, and for the purpose of settling and adjusting a contested claim, and avoiding litigation, wherefore by reason of the premises the defendant prays that plaintiff take nothing herein, and that defendant recover his costs."

The agreement referred to in the pleadings reads:

EXHIBIT A.

"Whereas, there is a misunderstanding about the payment of freight and feed on 2,600 lambs shipped from California about November, 1920. It is agreed between W. J. Farrar and Fred Perkins that each pay one-half of the freight, and when the freight is collected from T. L. Pitman or the Pitman Live Stock Company, it shall be divided equally between said Farrar and Perkins. If the freight shall be paid in sheep or lambs and there is a loss on them, the loss shall be shared equally and all expense in collecting, including attorney fees if any, shall be shared equally.

"With this agreement said Farrar acknowledges the receipt of $1,859.39 from Perkins, which is paid to him with the understanding that he advance an equal amount this day.                                      "W. J. FARRAR.
                                                        "FRED PERKINS.

"Executed at Oswego, Kan., this 17th day of February, 1921."

On the issues joined, a jury was waived and the cause was heard at length on many incidental and relatively minor or immaterial details. At the conclusion of the evidence, the pleadings and conceded facts showed that the defendant had received the nine carloads of lambs, and that although he was not designated as consignee in any bill of lading pertaining to the shipments, he did take into his possession the nine carloads of lambs without satisfying the legitimate charges of the carrier.

Informal findings of fact were made by the court, the most significant of which read:

"Q. 2. Did the defendant, Fred Perkins, ever present to the railroad company or a representative thereof, any bill of lading for the sheep? . . .

"BY THE COURT: I will answer question 2 in this way: From the circum-

stances surrounding the entire transaction the court infers that Mr. Perkins did not present to the railroad company a bill of lading for the sheep in question.

"BY COUNSEL FOR DEFENDANT: You remember one proposition that is clear in your mind—that these sheep were shipped by F. L. Pitman and billed to T. L. Pitman. How could Perkins have the bill of lading?

"BY THE COURT: I don't think it is very material. I will leave that finding as it is. I think the fair inference is that Mr. Perkins, while there is no direct testimony that I remember upon the point that he did or did not present a bill of lading or even that he had any, I think the fair inference is that he (Perkins) never presented any to the railroad company.  .  .  .

"Q. 4. Did defendant Perkins, at the time he took possession of the sheep, have good reason for believing, and did he believe, that the freight and feed charges on same had been paid to the railroad company?  .  .  .

"BY THE COURT: My impression from the testimony is this: That at the time Mr. Perkins got the sheep that he believed that Pitman was to pay the freight.  .  .  .

"Q. 13. Did Farrar receive, on the 16th day of February, 1921, a letter from one Thompson, informing Farrar, in substance, that he was about to lose his position as station agent for the railroad company on account of the unpaid freight bill?

"BY THE COURT: Referring to it by its proper exhibit, whatever it is, the court finds that that letter was received by the plaintiff. I am finding that that exhibit was received by the plaintiff, at about the time or within the due course of the mail, from the date it bears.

"Q. 14.  .  .  . Was plaintiff Farrar suffering mental anguish and worry, by reason of having received that letter from said Thompson, when he had his talk with Perkins, with reference to the freight on the 17th of February, or whatever the date was?

"BY THE COURT: The court finds that the plaintiff Farrar was worried after receiving the letter referred to in regard to the probability or the probable loss of his position.  .  .  .

"The court finds from all of the circumstances, as they appeared there, that Perkins probably realized and understood the same as any other person would realize and understand, that Mr. Farrar was afraid of losing his position and was worried on account thereof."

Judgment was entered for defendant, and plaintiff appeals.

Before addressing ourselves to appellant's assignment of errors in detail it will be well to take note of a few simple and pertinent features of the law of carriers bound to affect this lawsuit and which may completely control it, regardless of certain subordinate matters which occupied much time in the trial below and still encumber this appeal.

The modern law of carriers is largely the result of federal and state legislation of the last quarter of a century. Most of the common-law rights, remedies and duties of shippers and carriers have

been superseded by modern statutes. One specific matter which is regulated by statute with censorious particularity is that of freight rates. The carrier may not charge more and may not accept less than the regularly authorized freight tariffs permit. If the correct freight charge is not paid the carrier is bound to exhaust its available remedies to collect the balance due, and compromises which would or might savor of favoritism or of rebates to particular shippers are against public policy. Like a tax collector, the railway company must collect the proper charge and may not settle for less. Primarily a consignor is the person bound to pay the freight charges, but the consignee is likewise bound if he accepts the shipment, and one who receives the shipment as if he were the consignee stands in no better position than the nominally designated consignee. On various pertinent phases of this general subject, see the interstate commerce act (U. S. Comp. Stat. 1918, §§ 8564, 8565, 8594) and the public utilities act (R. S. 66-107, 66-109, 66-138; *Mollohan v. Railway Co.*, 97 Kan. 51, 54-56, 154 Pac. 248; *Railway Co. v. Stannard & Co.*, 99 Kan. 720, and citations, 162 Pac. 1176; *Easdale v. Railway Co.*, 100 Kan. 305, 308, 164 Pac. 164; *Railway Co. v. Wagner*, 102 Kan. 817, 172 Pac. 519; *Kennedy v. Railway Co.*, 104 Kan. 129, 133, 179 Pac. 314; *Case v. Union Pac. Rld. Co.*, 119 Kan. 706, 241 Pac. 693; *Farmers Grain Co. v. Atchison, T. & S. F. Rly. Co.*, 120 Kan. 21, 28, 245 Pac. 734; *Pittsburg &c Ry. Co. v. Fink*, 250 U. S. 577, 63 L. Ed. 1151; *N. Y. Cent. R. R. Co. v. York & Whitney Co.*, 256 U. S. 406, 65 L. Ed. 1016; *Union Pac. R. Co. v. American Smelting & Refining Co.*, 202 Fed. 720; *Great Northern Ry. Co. v. Hyder*, 279 Fed. 783; *Western & Atlantic Ry. Co. v. Underwood*, 281 Fed. 891; *Galveston H. & S. A. Ry. Co. v. Lykes Bros.*, 294 Fed. 968; *Pennsylvania R. R. Co. v. Titus*, 216 N. Y. 17, L. R. A. 1916E, 1127; *N. Y. C. R. R. Co. v. Ross Lumber Co.*, 234 N. Y. 261; *Waters v. Pfister & Vogel L. Co.*, 176 Wis. 16).

These elementary but fundamental principles of the modern law of carriers govern this case. Since defendant received these nine carloads of live stock and exercised dominion over them, driving them away from the railroad stockyards as if he were their owner or the regularly designated consignee, and thus deprived the railway company of its lien thereon, defendant cannot avoid payment of the carrier's lawful charges; and since he has so far paid but half of them the balance must now be forthcoming.

We have not failed to note carefully the argument of appellee

which seeks to uphold the trial court's judgment. It mainly proceeds on the theory that the matter in controversy is one of purely private concern between these litigants. It is far from that. In its legal aspects, it involves an important phase of public policy; and since the pleadings and uncontroverted evidence concede that defendant received these nine carloads of stock, and that he has paid only half of the carrier's lawful charges, defendant is liable absolutely. The latest authoritative decisions do not even admit a qualification of this rule to arise from the fact that the consignee or party accepting the shipment was misled into believing that the proper charges had been paid. (*Pittsburg &c Ry. Co. v. Fink*, supra; *N. Y. Cent. R. R. Co. v. York & Whitney Co.*, supra.) In *Great Northern Ry. Co. v. Hyder*, supra, the syllabus reads:

"A consignee, who is not at any time the owner of goods shipped, who has not agreed with either the shipper or the carrier that he will pay the freight, and who accepts the goods on the carrier's mistaken representation that the freight has been prepaid, is bound by such acceptance to pay the freight; shipper, carrier, and consignee all being agents and trustees for the public in the matter of the enforcement of freight rates."

The fact that the lambs were not billed to defendant is immaterial. He accepted them as if they were billed to him. (*Pennsylvania R. R. Co. v. Titus*, supra.) What business had he—any more than Tom, Dick or Harry—to meddle with these nine carloads of live stock unless he was prepared to assume the responsibilities of ownership or those of a regularly designated consignee? Defendant's liability for the carrier's charges does not merely arise out of an implied contractual relationship with the carrier, but because he accepted the nine carloads of live stock from the railway company, charged with knowledge that the lawful tariff rates thereon were a lien on the shipments, and that the carrier could neither ask more nor accept less than the full tariff charges thereon.

At the conclusion of the trial below there remained no material dispute of fact of present concern. The trial court's special findings do not and could not affect this main question. In so far as the findings of fact are against the plaintiff on the incidental matters of private damage set up in plaintiff's petition, he is, of course, concluded by those findings.

Touching the compromise set out in exhibit A, it was altogether ineffective to release and discharge defendant from his unqualified liability for the carrier's proper charges, not merely because of plaintiff's duress nor because as agent for the railway he had no

authority to compromise, but because such compromise was against public policy and in breach of statutory law. If that compromise had been effected with plaintiff's principal, through its president and board of directors, it would likewise have been wholly without legal effect.

That feature of appellee's defense based upon his private contract with Pitman, consignor, that Pitman and not defendant should pay the freight charges, is sheer sophistry. Neither the railway company nor plaintiff as its agent was bound by that contract. The case of *Western & Atlantic Ry. Co. v. Underwood,* 281 Fed. 891, is particularly pertinent and instructive. A potash company shipped goods in interstate commerce to Underwood, its agent, on a bill of lading reciting that the freight had been prepaid. On arrival it was discovered that the full charges had not been paid, and a small additional sum was demanded from Underwood. He stated that the goods were to be paid for by the shipper, and that he did not owe the freight, but to avoid delay and confusion would pay the sum demanded, if it was all, and did pay it on that understanding. Some months later it was discovered that $93 additional was due according to the lawful tariff, which sum was demanded of Underwood, and on its refusal the action was begun. The syllabus reads:

"A consignee cannot accept delivery of an interstate shipment of goods without incurring liability for the carrier's lawful charges, known or unknown, supposed to be prepaid or otherwise, and no matter what the consignee's actual relation to the shipper is."

In the opinion it was said:

"That the consignee cannot accept delivery without incurring liability for the carrier's charges, known or unknown, supposed to be prepaid or otherwise, and no matter what the consignee's actual relation to the shipper is, appears a harsh rule, but is seemingly established by authority. If by the shipper's omission the consignee is thus made liable for a charge which as between him and the shipper should not be borne by him, his recourse is on the shipper. The carrier is not bound by their private rights in the transaction, whether known or unknown to it, nor by any mistake or misrepresentation occurring, but under the law may look to the shipper as the original contractor to pay and to the person who as consignee accepts the goods and becomes by statute liable to discharge the lien thereon until the lawful charges are satisfied." (p. 893.)

The judgment of the district court is reversed and the cause remanded with instructions to enter judgment for plaintiff for $1,-959.39, with interest thereon from February 17, 1921, at 6 per cent per annum.