No. 32,330

KANOTEX REFINING COMPANY, *Appellee*, v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY, *Appellant*.

(46 P. 2d 16)

Opinion filed June 8, 1935.

*Bruce Hurd, C. J. Putt, R. M. Clark,* all of Topeka, and *J. A. McDermott,* of Winfield, for the appellant.

*Albert Faulconer,* of Arkansas City, and *James F. Lawrence,* of Tulsa, Okla., for the appellee.

The opinion of the court was delivered by

THIELE, J.: This was an action to recover damages growing out of a contract for the establishment of a freight rate.

There is no dispute as to the facts. The petition disclosed that plaintiff operated an oil refinery at Arkansas City, and in July, 1931, it had an opportunity to purchase 368 carloads of crude oil at Oklahoma City, Okla. Although not disclosed fully by the pleadings, it seems conceded that there was a published rate on file with

the interstate commerce commission under which it was determinable the rate from Oklahoma City to Arkansas City was ten cents per hundredweight. Before purchasing the oil plaintiff entered into negotiations, partly oral and partly written, with employees of the railway company, as a result of which it is alleged that if plaintiff would purchase the oil and transport it over defendant's road, the railway company "would immediately file and make effective a rate of six cents (6¢) per cwt. to apply on the transportation of said crude oil from Oklahoma City, Okla., to Arkansas City, Kan., via defendant's railroad," etc., the railroad company well knowing plaintiff would not purchase the oil and transport it unless the six-cent rate should be made effective and apply on the transportation. Relying on the agreement, plaintiff purchased the oil and tendered it to defendant for shipment to Arkansas City, and it was so shipped. The agreement seems to have been concluded by a letter from the plaintiff's traffic manager to the railway company freight agent at Topeka, dated July 15, 1931, in which it was said:

"We have already arranged for shipments Oklahoma City to Arkansas City and beginning today will move ten cars per day, which may shortly be considerably increased."

The petition alleges that sixteen cars were shipped July 17, 1931, and that thereafter the remainder were tendered and shipped. It appears from one of defendant's exhibits the shipments were between July 19 and September 26, 1931. The petition further alleged the railway company failed to publish the six-cent rate as agreed, and demanded and collected at the ten-cent rate, and that plaintiff had been damaged in the sum of $9,629.45, as shown by a tabulated list attached to the petition. The abstract does not show details of this list but does show total charge $24,073.57; amount had six-cent rate been applied, $14,444.12; overcharge, $9,629.45. In a second cause of action the allegations of the first cause are included by reference and it is further alleged that in order to mitigate damage the plaintiff shipped the oil to Arkansas City by the cheapest available method, paid the ten-cent rate, and by reason of the failure of the railway company to file the six-cent rate it had been damaged in the amount of $9,629.45.

The defendant answered that the petition failed to state a cause of action, that the court had no jurisdiction of the subject matter, and admitted the material allegations of the petition except as they were denied. It then denied it had failed to publish the rate or to

cause the same to become effective or that it had failed to take any steps to that end, but alleged that following the usual and customary course of procedure, which was well known to plaintiff, it did, on July 15, 1931, request F. A. Leland, its duly authorized tariff agent and the duly authorized agent of the southwestern railroads, being all the railroads operating in Oklahoma, to submit an emergency proposal for the rate and the filing of a tariff covering the same with the interstate commerce commission; that Leland submitted the proposal to the southwestern railroads and to interested chambers of commerce and shippers for approval, which approval was refused, and thereafter the proposal was submitted to the executive committee of the southwestern railroads for approval, which was refused; that on August 5 Leland notified the southwestern railroads of the defendant's intention to independently establish the six-cent rate, and notice of his intention was by Leland issued August 31, 1931, announcing the publication of the six-cent rate; that the rate was published in Supplement 36, SWL Tariff 79-L, Agent J. E. Johansen's I. C. C. 2170, under special permission of the interstate commerce commission, the supplement bearing issuing date of October 6, 1931, and effective date of November 17, 1931; that from the time of the first conversation as to the rate until the issuance and publication of August 31, 1931, there was no delay. It is also alleged that an application to the interstate commerce commission for reparation to the shipper was made by defendant, the application being denied. There is also an allegation that on July 1, 1933, the plaintiff filed an action before the interstate commerce commission for reparation in the amount of $9,629.45, which was still pending.

Plaintiff moved to strike that part of the answer in which defendant gave the history of its efforts to get the six-cent rate promulgated, and that part setting up plaintiff's action before the interstate commerce commission. Upon hearing, the court sustained the motion. At the same time the parties agreed that motion for judgment on the pleadings could be presented, which was done, and upon consideration the court found the answer did not state facts sufficient to constitute a defense; that the defendant's answer admitted the contract and the failure of the defendant to perform the conditions imposed in the contract and the amount of the damages, and judgment was accordingly rendered in favor of plaintiff, from which the defendant appeals, assigning as error the sustaining of the motion and the rendering of the judgment.

As has been noted, there is no dispute as to the facts, and it is possible to dispose of the case on its merits, and without discussion separately of the motion to strike and the motion for judgment on the pleadings. The appellant's principal contention is that a railroad cannot be held legally liable for its failure to carry out an agreement to have put into effect in the future a lesser rate than was lawfully in effect at the time of the promise and at the time the shipments were moved. Appellee's answer is that its action is not a rate case nor for reparation, but is one for failure of performance of the contract to file and publish a rate and not violative of any statute.

In substance, the alleged contract was that if plaintiff would buy oil and ship it over defendant's lines, defendant would *immediately file and make effective* a lower rate than was in effect. The facts are that plaintiff bought the oil and within two days started shipments which were concluded in thirty-eight days, or a period of forty days after the contract was made. Whatever may have been the reason, the defendant in that time did not make effective the lower rate. Plaintiff paid the higher rate and seeks to recover the difference between the two rates.

The allegations of the petition and the facts show that this was a shipment in interstate commerce, and therefore that the rates to be charged for transportation are governed by the provisions of the interstate commerce act (U. S. C. A., Title 49), the principal objects of which were to secure just and reasonable charges for transportation, to prohibit unjust discriminations and to prevent undue and unreasonable preferences. As was said in *Louisville & N. R. Co. v. U. S.*, 282 U. S. 740, 51 S. Ct. 297, 75 L. Ed. 672:

"The legislative history of the interstate commerce act shows clearly that the evil of discrimination was the principal thing aimed at." (p. 749.)

Section 1, paragraph (1), of the act makes its provisions apply to transportation of property by railroad from one state to another. Section 6, paragraph (1), requires every carrier to file with the commission and to keep open to public inspection schedules showing all rates and charges for transportation between points on its own lines. Section 6, paragraph (3), provides in part:

"No change shall be made in the rates, fares and charges or joint rates, fares and charges which have been filed and published by any common carrier in compliance with the requirements of this section, except after thirty days' notice to the commission and to the public published as aforesaid, which shall

plainly state the changes proposed to be made in the schedule then in force and the time when the changed rates, fares, or charges will go into effect; and the proposed changes shall be shown by printing new schedules, or shall be plainly indicated upon the schedules in force at the time and kept open to public inspection: *Provided,* That the commission may, in its discretion and for good cause shown, allow changes upon less than the notice herein specified, or modify the requirements of this section in respect to publishing, posting and filing of tariffs, either in particular instances or by a general order applicable to special or peculiar circumstances or conditions."

And section 6, paragraph (7), provides:

"No carrier, unless otherwise provided by this chapter, shall engage or participate in the transportation of passengers or property, as defined in this chapter, unless the rates, fares and charges upon which the same are transported by said carrier have been filed and published in accordance with the provisions of this chapter; nor shall any carrier charge or demand or collect or receive a greater or less or different compensation for such transportation of passengers or property or for any service in connection therewith, between the points named in such tariffs than the rates, fares and charges which are specified in the tariff filed and in effect at the time; nor shall any carrier refund or remit in any manner or by any device any portion of the rates, fares and charges so specified, nor extend to any shipper or person any privileges or facilities in the transportation of passengers or property, except such as are specified in such tariffs."

Section 6, paragraph (10), prescribes heavy penalties for violation of any order made by the commission with respect to rates.

Under the above section, from which only parts have been referred to or quoted, it has been held repeatedly that an express contract by an interstate carrier to carry for less than the schedule rate is void and will not preclude it from demanding or recovering the proper schedule rates. (See cases cited in U. S. C. A., Tit. 49, sec. 6, par. 7, notes of decisions No. 1, p. 286.)

Appellee argues that the present contract does not offend; that the contract was not to obtain a preference on its part, but was an agreement on the part of defendant that it would immediately file the lower rate, which when so filed would be available to all shippers of a like article; that it was possible, had the defendant proceeded properly and had it not consulted other railroads and chambers of commerce, for it to have had the rate in effect within two or three days. This argument ignores features of the interstate commerce act of which it had to take notice, one that, except as the interstate commerce commission might waive it, thirty days' notice is required before an altered rate may become effective. Another is that the

shipper knew that whether the rate would be changed was solely within the power and jurisdiction of that commission and that the railway company could do no more than honestly endeavor to have the new rate lawfully established. The argument also ignores an obvious thing. Notwithstanding the agreement was to file the rate immediately, it was well known to both parties to the agreement that an application had to be prepared, it had to move from Kansas to Washington, D. C., it had to be filed, and it had to receive attention from those in authority, before even the thirty-day notice could be, if it ever was to be, waived, and, assuming its waiver, an appropriate order had then to be made. "Immediately" does not mean instantly, but, most favorably to plaintiff, without delay. We cannot say how soon, without delay, a lower rate could be made legally effective, but we can say that in view of statutory requirements, distances and other elements inherent in the matter that when in two days plaintiff commenced shipments, defendant had not had time to file the new schedule, and plaintiff knew it. Plaintiff also was bound to take notice of the statute that, unless notice was waived, a new rate would not be established in less than thirty days.

Appellant argues that under the interstate commerce act the published rate of ten cents was the legal rate; that no change could be made except after thirty days' notice to the commission and to the public; that until such change had been lawfully made it could not, without incurring penalty, demand or receive any other rate than the published rate, and that any attempted agreement to the contrary was void.

There are many decisions dealing with various phases of rate regulation under the interstate commerce act. Many of these are cited in an annotation on "Carrier's right or liability in respect of excess of lawful charge over charge understated where discrimination is forbidden" (83 A. L. R. 245). See, also, note in 38 L. R. A., n. s., 351.

*Armour Packing Co. v. United States,* 209 U. S. 56, 28 S. Ct. 428, 52 L. Ed. 681, was an appeal from a conviction under the Elkins act for carrying goods at less than published rates. It was there said:

"It is said that if the carrier saw fit to change the published rate by contract the effect will be to make the rate available to all other shippers. *But* the law is not limited to giving equal rates by indirect and uncertain methods. It has provided for the establishing of one rate, to be filed as provided, subject to change as provided, and that rate to be while in force the only legal rate.

Any other construction of the statute opens the doors to the possibility of the very abuses of unequal rates which it was the design of the statute to prohibit and punish." (p. 81.)

*Railway Co. v. Albers*, 79 Kan. 59, 99 Pac. 819, involved the liability of a carrier which had been garnisheed to refund an excess between a claimed promulgated rate and a contract rate, where collection had been made at the higher rate. For a full statement reference is made to the opinion. The trial court allowed recovery and this court affirmed the judgment. On appeal to the United States Supreme Court the judgment was reversed in *Kansas City So. Ry. v. Albers Comm. Co.*, 223 U. S. 573, 32 S. Ct. 316, 56 L. Ed. 556, where, in discussing the validity of the agreement to transport at a stipulated rate, it was said:

"We are thus brought to the question of the validity of that agreement. Not only did it contemplate a departure from the established local rates for the benefit of a single shipper, but no schedule embracing the rates agreed upon was filed with the interstate commerce commission. Section 6 of the interstate commerce act, as it existed at the time, laid upon every carrier subject to the provisions of the act the duty of filing with the commission and publishing schedules of the rates to be charged for the transportation of property over its road, provided for changing and superseding such rates by new schedules so filed and published, and made it unlawful for such a carrier to depart from any rate so established and in force at the time. . . . The chief purpose of the act was to secure uniformity of treatment to all, to suppress unjust discriminations and undue preferences, and to prevent special and secret agreements, in respect of rates for interstate transportation, and to that end to require that such rates be established in a manner calculated to give them publicity, to make them inflexible while in force, and to cause them to be unalterable save in the mode prescribed. . . . To avoid any misapprehension in respect of the character of the liability sought to be enforced in this case, we deem it well to repeat that there was no claim of any right to reparation or damages under the interstate commerce act, and no claim that the rate collected was unreasonable, preferential, discriminatory, or otherwise violative of that act, but only an attempt to enforce a supposed liability for a breach of the special agreement. (See *Texas and Pacific Railway v. Abilene Cotton Oil Co.*, 204 U. S. 426, 51 L. Ed. 553, 27 Sup. Ct. Rep. 350, 9 A. & E. Ann. Cas. 1075; *Robinson v. Baltimore & Ohio Railroad Co.*, 222 U. S. 506, *ante*, 288, 32 Sup. Ct. Rep. 114.)" (pp. 596-598.)

In *Louisville & Nash. R. R. v. Maxwell*, 237 U. S. 94, 35 S. Ct. 494, 59 L. Ed. 853, L. R. A. 1915E 665, the facts were that Maxwell, after repeated interviews with the railroad company as to the passenger fare from Nashville, Tenn., to Salt Lake City, Utah, purchased tickets at a stipulated rate, for a stipulated route, which it

developed was below the published rate. In the opinion allowing the company recovery of the difference between the amount collected and the published rates, the court said:

"Under the interstate commerce act the rate of the carrier duly filed is the only lawful charge. Deviation from it is not permitted upon any pretext. Shippers and travelers are charged with notice of it, and they as well as the carrier must abide by it, unless it is found by the commission to be unreasonable. Ignorance or misquotation of rates is not an excuse for paying or charging either less or more than the rate filed. This rule is undeniably strict and it obviously may work hardship in some cases, but it embodies the policy which has been adopted by congress in the regulation of interstate commerce in order to prevent unjust discrimination." (p. 97.)

York and Whitney were commission merchants who accepted delivery of perishable merchandise and paid the freight charges thereon as demanded, sold the goods, and on the basis of freight paid, settled with the shippers. It developed that less than the lawful rate had been collected. The railroad brought suit in the state court to collect a deficit between the amount paid and the amount due under the published rate. The case ultimately reached the United States Supreme Court. In disposing of the appeal (*N. Y. Cent. R. R. v. York & Whitney Co.*, 256 U. S. 406, 41 S. Ct. 509, 65 L. Ed. 1016) it was said:

"The transaction between the parties amounted to an assumption by the consignee to pay the only lawful rate it had the right to pay or the carrier the right to charge. The consignee could not escape the liability imposed by law through any contract with the carrier." (p. 408.)

In *Prince Line Limited v. American Paper Exports, Inc.*, 45 F. 2d 242, reference is made to 49 U. S. C. A. (sec. 6, par. 7), and it is there said:

"Construing this provision of the interstate commerce act, the courts have held that the rate of the carrier duly filed is the only lawful charge, and that deviation from it is not permissible upon any pretext, and that no contract of the carrier can reduce the amount legally payable, and that no act or omission of the carrier can estop or preclude it from enforcing payment of the full amount by a person liable therefor, and that, though the rule may work hardships in some cases, it embodies the policy which has been adopted by congress in the regulation of interstate commerce in order to prevent unjust discrimination. (*Louisville & N. R. Co. v. Central Iron & Coal Co.*, 265 U. S. 59, 65, 44 S. Ct. 441, 68 L. Ed. 900; *Louisville & N. R. Co. v. Maxwell*, 237 U. S. 94, 97, 35 S. Ct. 494, 59 L. Ed. 853, L. R. A. 1915E, 665.)"

While none of the above cases deals with a situation identical with that presented in the case at bar, it appears that the rule is

that the legal rights existing between a shipper and a carrier as to rates in interstate commerce are measured by the tariffs or rates published and on file with the interstate commerce commission; that no deviations from such published rates can be made on any pretext, and an agreement the purport of which is to permit collection of charges at other than the published rates is of no binding force or effect. And the decisions of this court have recognized such to be the rule. (*Railway Co. v. Refining Co.*, 83 Kan. 732, 112 Pac. 604; *Schenberger v. Railroad Co.*, 84 Kan. 79, 113 Pac. 433; *Railway Co. v. Wagner*, 102 Kan. 817, 172 Pac. 519; *Case v. Union Pac. Rld. Co.*, 119 Kan. 706, 241 Pac. 693; *Parker Corn Co. v. Chicago B. & Q. Rld. Co.*, 120 Kan. 484, 244 Pac. 240.)

In *Railway Co. v. Stannard & Co.*, 99 Kan. 720, 162 Pac. 1176, it was held:

"All special arrangements, agreements, customs and understandings between individual shippers and interstate railroads, not open to all similar shippers on equal terms, nor on file with the interstate commerce commission nor sanctioned by that tribunal, are void, and a defense to an action for interstate freight charges based thereon is subject to demurrer or motion for judgment." (Syl. ¶ 3.)

A situation somewhat similar to the one which confronts us was involved in *Oregon-Wash. R. & N. Co. v. Cascade C. Co.*, 101 Or. 582, 197 Pac. 1085. That case had many elements not in the instant case, but it does appear that the contract company applied to the carrier for a lower rate on shipments of rock, and the carrier advised the shipper that it would establish such a rate, but the rate was not filed until long after the shipments were made. In disposing of a suit to collect balances due, the court said:

"In other words, the plaintiff seems to have neglected to file the amended rate, and the defendant, without waiting for its promulgation, shipped the rock and hence became liable for the freight as computed under the schedule of tariff in force at the time the shipment moved. The defendant was bound to know the existing tariff. It was charged with knowledge that the plaintiff could not charge less or more than, or any rate different from that prescribed in the current schedule. It is fair to say that in seeking to protect its promise, but, as it appears, when it was too late, the record shows that the plaintiff applied to the Interstate Commerce Commission for leave to refund to the defendant the difference of $1,394.39, but was refused by the commission on the ground that this would constitute a preference not allowed by the interstate commerce law or the tariff in force at the time. This is clearly within the policy of the law, for any other shipper of stone would have a right to rely upon the published tariff in force at the time, and ought not to be subject to the preference that would arise out of refunding to the defendant a

portion of the freight which it paid under the existing tariff, although it relied upon the promise of the plaintiff to promulgate a lower rate. In other words, the defendant paid the rate in force at the time, and must be bound thereby. The record does not show any legal ground for a counterclaim on behalf of the defendant in that matter." (p. 590.)

Answering appellee's argument that had the defendant filed the lowered rate immediately, meaning by that within a few days, it would have been available to all shippers, that might be true, but it bought the particular oil with the idea in mind it would be transported at the lower rate. We do not intend to cast any aspersions on the good faith of the plaintiff, but conceivably it may have purchased the oil on a more favorable basis because the seller knew it would, according to the published tariff, cost ten cents per hundredweight to move it to Arkansas City, and knew nothing about any agreements between plaintiff and defendant to the contrary. Good faith and laudable motive or the converse thereof do not enter into the matter, however. The purpose of the interstate commerce act is to prevent discrimination or preference, and the decisions are uniformly to the effect that published rates cannot be modified by contract, and that under no pretext can the carrier exact less nor more than the published and effective rate. Had appellee desired so to do it could have waited until the rate was effective. It could not immediately start shipments and, under the guise of collecting damages, in effect get the benefit of a rate not then available to the public at large. The converse of the proposition shows its correctness. Suppose the situation had been somewhat reversed, and for reasons sufficient to it the refining company had agreed to pay a twelve-cent rate instead of the published ten-cent rate, and upon completion of the shipment and demand for payment had refused to pay any but the published rate. Under the many decisions of the federal and state courts, could it be contended the railway company could recover the difference? We think not.

Appellee raises a question of pleading: That a defense that a contract is in violation of the interstate commerce law of the United States must be pleaded, and that there is no such allegation in defendant's answer. It is true that in *Railway Co. v. Bagley*, 60 Kan. 424, 56 Pac. 759, we so held. A similar question was raised in *Sage v. Oil Country Specialists Mfg. Co.*, 138 Kan. 501, 27 P. 2d 542, and it was there held that when it becomes apparent a contract sued on is in violation of law, it is the duty of the court to dismiss the action whether the illegality has been raised by the pleadings or not. (See

the cases cited in that opinion.) Perhaps the defendant could have pleaded more definitely, but it did allege that the allegations of plaintiff's petition did not state a cause of action, and, if we should adhere strictly to the rule in the Bagley case, that allegation would probably be sufficient. If it be assumed that the general rule required the defendant to plead specifically the illegality, we should not hesitate to make an exception, where otherwise the result would be to permit a recovery based on a void and illegal contract.

As we view the matter, the trial court ruled correctly on the motion to strike, because the reasons why the defendant did not more promptly proceed to carry out the alleged agreement were immaterial. So far as the plaintiff's action before the interstate commerce commission is concerned, we need not here discuss whether or not it constituted an election of remedies, for, on the undisputed facts, we hold the plaintiff was not entitled to recover.

The judgment of the trial court is reversed.